LEVITT AND SONS, INCORPORATED, A NEW YORK COR-
PORATION, PLAINTIFF-APPELLANT, v. DIVISION
AGAINST DISCRIMINATION IN THE STATE DEPART-
MENT OF EDUCATION, WILLIE R. JAMES AND FRANK-
LIN D. TODD, DEFENDANTS-RESPONDENTS, AND
GREEN FIELDS FARM, INC., A NEW JERSEY COR-
PORATION, PLAINTIFF-APPELLANT, v. DIVISION
AGAINST DISCRIMINATION IN THE STATE DEPART-
MENT OF EDUCATION AND YUTHER GARDNER, DE-
FENDANTS-RESPONDENTS.

Argued December 22, 1959—Decided February 9, 1960.

*Mr. Harold E. Kohn,* of the Philadelphia Bar, argued the cause for the plaintiffs-appellants (*Messrs. Pitney, Hardin & Ward,* attorneys for plaintiff-appellant Levitt and Sons, Incorporated; *Mr. Sidney S. Jaffe,* attorney for plaintiff-

appellant Green Fields Farm, Inc.; *Messrs. William P. Reiss* and *Clyde A. Szuch,* on the brief).

*Mr. David D. Furman,* Attorney General of New Jersey, argued the cause for the defendant-respondent Division Against Discrimination in the State Department of Education (*Mr. Lee A. Holley,* Deputy Attorney General, of counsel).

*Mr. Julius Wildstein* argued the cause for all individual defendants-respondents (*Messrs. Kapelsohn, Lerner, Leuchter & Reitman,* and *Emerson L. Darnell,* attorneys for defendant-respondent Willie R. James; *Messrs. Herbert H. Tate* and *Jerome C. Eisenberg,* attorneys for defendant-respondent Franklin D. Todd; *Mr. Julius Wildstein,* attorney for defendant-respondent Yuther Gardner, and of counsel for all other individual defendants-respondents; *Messrs. Julius Wildstein* and *Joseph B. Robison,* of the New York Bar, and *Mrs. Ruth Blumrosen* of the Michigan Bar, on the brief).

The opinion of the court was delivered by

BURLING, J. The plaintiff Levitt and Sons, Incorporated, a New York corporation authorized to do business in New Jersey (hereinafter referred to as Levitt) is the developer of a single home housing project called Levittown, located in Levittown Township, Burlington County, New Jersey. The plaintiff Green Fields, Inc., a New Jersey Corporation (hereinafter referred to as Green Fields) is the developer of a similar project called Green Fields Village, located in West Deptford Township, Gloucester County, New Jersey. Defendants Todd and James allegedly were rejected by Levitt as purchasers of houses in Levittown because of their color; both are Negroes. Defendant Gardner, also a Negro, allegedly was rejected by Green Fields as a purchaser of a house in Green Field Village because of his color. All three, Todd, James and Gardner, filed individual complaints with the

New Jersey Division Against Discrimination (hereinafter referred to as DAD) charging the plaintiffs with refusals to sell to the individual defendants in violation of the New Jersey Law Against Discrimination, *N. J. S. A.* 18:25-1 *et seq.*, and seeking an order of the DAD requiring the plaintiffs to cease and desist their discrimination against the complainants. Findings of probable cause for the complaints were made by the DAD pursuant to *N. J. S. A.* 18:25-14, and attempts at conciliation pursuant to the same statute were unsuccessful. Each of the individual defendants then filed amended complaints, Todd and James naming William J. Levitt, an officer of Levitt, as an additional respondent to their complaints, and Gardner naming Robert A. Budd and Horace B. Peters, officers of Green Fields, as additional respondents to his complaint. The complaints were set down for hearings (Gardner's complaint was to be heard separately from Todd's and James') but postponed to a later date.

Before they could be held, however, Levitt and Green Fields instituted independent suits in lieu of prerogative writs in the Superior Court, Law Division, challenging the jurisdiction of the DAD to hear the discrimination complaints and attacking the constitutionality of the New Jersey Law Against Discrimination. The suits were consolidated for hearing and on defendants' motion were dismissed by the trial court on the grounds that an appeal from any action of the DAD must be taken to the Superior Court, Appellate Division, as provided in *R. R.* 4:88-8(*b*) and that in any event plaintiffs had failed to exhaust their administrative remedies, *R. R.* 4:88-14. Plaintiffs appealed to the Superior Court, Appellate Division. That court agreed to hear the matter as if leave had been requested and granted to appeal from the DAD's setting down of the discrimination complaints for hearing and then decided the cause on its merits. 56 *N. J. Super.* 542 (*App. Div.* 1959). It held the Law Against Discrimination, *N. J. S. A.* 18:25-1 *et seq.*, to be constitutional and affirmed the jurisdiction of the DAD to consider the discrimination complaints. It dismissed, how-

ever, those complaints insofar as they related to the individual respondents, William J. Levitt, Robert A. Budd and Horace B. Peters, holding that as to these persons the discrimination complaints were not filed within the time required by the statute, from which determination no appeal has been taken. Levitt and Green Fields appealed to this court from that part of the Superior Court, Appellate Division's decision applicable to them. The appeal is made to this court as a matter of right because of the substantial constitutional questions involved. R. R. 1:2–1(a). Since the filing of the actions in lieu of prerogative writs, the hearings in the DAD on the discrimination complaints have been stayed by successive orders, first by the trial court, then by the Superior Court, Appellate Division. Before the arguments in this court, however, we granted the DAD's motion to permit the hearings in the DAD to continue.

Levitt's single home housing project, Levittown, in which approximately 2,000 houses have been built to the present time, will contain 16,000 houses when completed, according to original plans. Green Fields' project, Green Fields Village, comprises approximately 550 houses, all of which have been sold. Originally 700 units were to have been constructed in Green Fields Village, but all houses constructed to date have been sold, and apparently no new construction has begun. Both projects have been planned and constructed in order that they might qualify for purchase money loans insured by the Federal Housing Administration (FHA), a process which requires attention to the desired end from the very earliest beginnings of the development.

Before construction has begun, a housing project developer who seeks to have FHA insured loans available to purchasers of his houses must contact an FHA office in the region in which the project will be located to obtain FHA approval of the site selected for the project. Once a site approval is given, the developer will submit detailed subdivision information to the FHA office, on a form prepared by the FHA, together with certain exhibits, such as a topographic

map, photographs, detailed development plan and like items; frequently these are amended or completely revised to accord with suggestions made by the FHA. When the subdivision information and exhibits are satisfactory to the FHA, that agency issues a subdivision report, giving FHA requirements concerning street layouts, curb and sidewalk specifications, utilities, drainage, open spaces, lot improvements and similar matters. House plans are submitted to determine if they meet FHA requirements; the FHA architectural section will often recommend changes in these plans. Upon receiving the subdivision report, the developer arranges with an FHA-approved lending institution to submit individual applications for commitments for FHA insurance on any loan which might be made by the institutions. These individual applications are reviewed by the architectural, valuation and mortgage credit sections in addition to the Chief Underwriter's office, after which commitments are issued to the approved lending institution covering the individual properties contemplated in the application. These commitments take various forms. One is a conditional commitment, an agreement between the FHA and the approved lending institution that, subject to the conditions stated in the commitment and subject to the approved lending institution's submitting a proposed purchaser whose qualifications are satisfactory to the FHA, a loan made to finance the purchase of the property in question will be insured. Another form of commitment is an "Operative-Builder Firm Commitment," which differs from a conditional commitment primarily in that the former also contemplates loans being made directly to the developer, prior to sale, if requested.

Once the commitment is issued, the developer may commence construction. As construction progresses, the developer or the approved lending institution through which the FHA commitment was made arranges for an FHA inspection. Normally three such inspections are made during the course of construction. In some larger developments, such as Levittown, an FHA inspector is stationed at the project. Often

the inspector or other FHA personnel will meet with the developer to discuss problems that have arisen during construction affecting compliance with FHA requirements. As the houses are sold by the developer to purchasers interested in obtaining an FHA insured mortgage loan, an application for approval of the purchaser is submitted to the FHA by the approved lending institution to whom the conditional commitment was made. If the qualifications of the purchaser are satisfactory to the FHA, an individual firm commitment is issued to the approved lending institution in the name of the purchaser. After title is closed, the approved lending institution submits the mortgage bond to the FHA along with copies of the bond, the mortgage and the original commitment. When these are approved, the FHA endorses the bond for insurance, which comprises the contract between the FHA and the lender.

Having received conditional commitments, the developer advertises the availability of FHA financing to purchasers. By using FHA insured loans, a purchaser needs only a 3% downpayment on a principal sum of up to $13,500, 15% on the difference between $13,500 and $16,000, and 30% on the difference between $16,000 and $20,000. The term of the loan may be as long as 30 years. Conventional financing often involves downpayments of 20% to 25% and frequently will be limited to terms of 20 to 25 years. Thus it is apparent that FHA financing is a large factor in stimulating home buying, since the low downpayment opens the home market to persons who have accumulated only small savings and the extended term of the loan allows home ownership to be achieved by payments from income by a much larger proportion than would ordinarily be the case. Concerning the importance of FHA approval to the large housing project developer, Robert A. Budd, president of Green Fields, stated on his deposition that such approval "is the basics (sic) on which to go on." William Levitt, president of Levitt, stated before the House Subcommittee on Housing of the Committee on Banking and Currency of the Eighty-Fifth

Congress that "We are 100 percent dependent on Government. Whether this is right or wrong it is a fact." Only a very small percentage of the buyers of homes in Levittown and Green Fields Village financed their purchase other than with federally insured loans.

## I.

Since the questions involved in this appeal relate to the jurisdiction of the administrative agency and the constitutionality of the statute on which the administrative action in question is based, it is apparent that plaintiffs should not be made to exhaust their administrative remedies before pursuing the present action. *Fischer v. Bedminster Tp.,* 5 *N. J.* 534, 542 (1950); *Ward v. Keenan,* 3 *N. J.* 298, 302–309 (1949). The questions are purely legal, an area where the administrative expertise would be of no real value. Under such circumstances, we have consistently held that exhaustion of remedies will not be required. *Honigfeld v. Byrnes,* 14 *N. J.* 600, 604 (1954); *Nolan v. Fitzpatrick,* 9 *N. J.* 477, 487 (1952). And the applicable rule, *R. R.* 4:88–14, has been so interpreted. *Honigfeld v. Byrnes, supra.* We may proceed, therefore, to the merits of the appeal.

## II.

First to be determined is whether the DAD has jurisdiction under the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq.,* to entertain the complaints brought by the individual defendants against the plaintiffs. There are two questions here. The first is whether the plaintiffs' developments are "publicly assisted housing accommodation" as that phrase is used in section 4 of the Law Against Discrimination and amplified by section 5(*k*) of that statute. The second is, if plaintiffs' developments are within the classification, whether the statute gives the DAD jurisdiction to hear or act on complaints claiming discrimination with respect thereto.

## A.

Does "publicly assisted housing accommodation" as used in section 4 of the Law Against Discrimination, *N. J. S. A.* 18:25–4, apply to plaintiffs' projects? Plaintiffs point to *N. J. S. A.* 18:25–5(*k*), which states:

"k. 'A publicly assisted housing accommodation' shall include all housing built with public funds or public assistance pursuant to chapter 300 of the laws of 1949, chapter 213 of the laws of 1941, chapter 169 of the laws of 1944, chapter 303 of the laws of 1949, chapter 19 of the laws of 1938, chapter 20 of the laws of 1938, chapter 52 of the laws of 1946, and chapter 184 of the laws of 1949, and all housing financed in whole or in part by a loan, whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the Federal Government or any agency thereof."

In approaching the construction of the statute it is necessary to be mindful of the clear and positive policy of our State against discrimination as embodied in *N. J. Const., Art.* I, *par.* 5. Effectuation of that mandate calls for liberal interpretation of any legislative enactment designed to implement it.

Plaintiffs argue that, since any other portion of this statute is not applicable, their projects are publicly assisted housing accommodations only if they are "housing financed in whole or in part by a loan, whether or not secured by a mortgage, the repayment of which is guaranteed or insured by the Federal Government or any agency thereof." And even this portion of section 5(*k*) is not applicable, plaintiffs contend, inasmuch as their projects were financed on an entirely private basis until title passed from the developer to the purchaser, at which point there could be no discrimination by the developer since the house was no longer within his control. Stated with greater particularity, the argument is that the Law Against Discrimination, insofar as it relates to housing, imposes the principle of non-discrimination in selecting a purchaser only on the condition that the housing is *"financed * * * by [federally insured] loans * * *."* (Emphasis supplied) If the housing is not so financed, the

owner may act discriminately in selecting a purchaser. This implies, plaintiffs contend, that the federally insured loan must be in existence with respect to the housing at the time the discrimination occurs if it is to be said that the discrimination violates *N. J. S. A.* 18:25–1 *et seq.* If there exists at the time of discrimination only an FHA commitment to insure a loan made with respect to the house, plaintiffs argue that this is not enough. The statute, they urge, applies only if these exists at the time of discrimination a federally insured loan made with respect to the housing in question. Thus, pointing to their own situation plaintiffs conclude that since the discrimination could occur only as to the houses still owned by plaintiffs. and since at the time none of these houses were financed by a federally insured loan, the discrimination charged against plaintiffs could not have violated the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq.* While plaintiffs admit that the houses they built most likely, when sold, *would be* financed by a federally insured loan, and the FHA commitments were obtained in *contemplation* of such financing, they argue that the statute does not speak in terms of future possibilities, but only of existing conditions. To support this conclusion, plaintiffs contend that if the Legislature had intended the Law Against Discrimination to apply to housing as to which FHA commitments to insure had been issued, it could easily have done so. They point to the New York Law Against Discrimination. which served as a pattern for the New Jersey statute. It has a provision absent in the New Jersey statute relating to housing as to which FHA commitments have been issued, N. Y. Executive Law, § 292, *subd.* 11(*e*), the implication being that by omitting this provision, our Legislature intended to remove such housing from the coverage of this State's act. Furthermore, plaintiffs would draw the same conclusion from the Legislature's failure subsequently to adopt bills which would have expressly included the FHA commitment situation within the New Jersey Law Against Discrimination.

Under the view we take of the statute in question, however, it is unnecessary to decide whether section 5(k) of the statute as it now reads applies to houses as to which FHA commitments to insure loans have been issued. It may be noted, however, that there is much persuasive force in the argument that in the context of this type of case a liberal interpretation of the word "financed" is justified and required, and under such interpretation plaintiffs' housing should be considered "financed" by a loan secured by a mortgage, the repayment of which is insured by the federal government. But even admitting for the sake of argument the validity of plaintiffs' contention described above, we believe that *N. J. S. A.* 18:25–4 applies to the developments in question.

Section 4 of the Law Against Discrimination, *N. J. S. A.* 18:25–4, states:

"All persons shall have the opportunity to obtain employment, to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation and publicly assisted housing accommodation, without discrimination because of race, creed, color, national origin or ancestry, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right."

The plaintiffs would confine the meaning of "publicly assisted housing accommodation" to those examples enumerated in *N. J. S. A.* 18:25–5(k). We disagree. Rather, we believe the type of housing listed in section 5(k) to be only illustrations of the meaning of the phrase being considered, rather than an exhaustive enumeration. The reason for this conclusion lies in the Legislature's use of the words "shall include." In *State v. Rosecliff Realty Co.,* 1 *N. J. Super.* 94 (*App. Div.* 1948), certification denied 1 *N. J.* 602 (1949), the court was considering an alleged violation of the civil rights statute, *R. S.* 10:1–1 *et seq.* Involved was whether a swimming pool was a "place of public accommodation, resort, or amusement" as that phrase is used in the civil rights statute. The latter phrase was defined in *R. S.* 10:1–5

which stated that the term "shall be deemed to include" many specific places, none of which was a swimming pool. The court stated:

"The court below was of the opinion 'that the legislature went to great length in setting forth and defining "place of public accommodation, resort or amusement." ' This view is incorrect. The language of section 5 is 'a place of public accommodation, resort or amusement within the meaning of this chapter shall be deemed to include' certain enumerated places. If it was the intent to narrow the broad scope of the phrase 'any places of public accommodation, resort or amusement,' as used in section 2, inept language was used for that purpose. The verb 'include' has not been defined so as to give to it such a restrictive meaning." *State v. Rosecliff Realty Co., supra,* 1 *N. J. Super.,* at *page* 101.

In *American Surety Co. of New York v. Marotta,* 287 *U. S.* 513, 517, 53 *S. Ct.* 260, 77 *L. Ed.* 466 (1933), the Supreme Court held that the term "creditors," as used in the Federal Bankruptcy Act, has a broader meaning than the specific examples of the term given in the definitions section of that statute, which examples were headed by a phrase indicating that, for the purposes of the Bankruptcy Act, the word "creditor" shall include certain persons. To the same effect concerning the meaning of "include," see *Central R. Co. of New Jersey v. Director, Division of Tax Appeals,* 8 *N. J.* 15, 28 (1951); *United States v. Gertz,* 249 *F. 2d* 662 (9 *Cir.* 1957); *People v. Western Air Lines,* 42 *Cal. 2d* 621, 268 *P. 2d* 723 (*Sup. Ct.* 1954); *Red Hook Cold Storage Co. v. Department of Labor,* 295 *N. Y.* 1, 64 *N. E. 2d* 265, 163 *A. L. R.* 439 (*Ct. App.* 1945).

Two further observations are pertinent. First, the Legislature, by certain portions of the definitions section of the Law Against Discrimination, *N. J. S. A.* 18:25–5, evinced its ability to give a term an exclusive definition by stating that the term shall "mean" certain things. *N. J. S. A.* 18:25–5(*g*), (*h*), and (*j*). Second, the Legislature's failure to state expressly that housing covered by FHA commitments was within the Law Against Discrimination, either by copying that portion of the New York statute relating to such

commitments or by adopting amendments to the Law Against Discrimination intended to achieve the same result, can be attributed to the general phrase "publicly assisted housing accommodation" being considered as sufficient by itself to include such housing within the purview of the statute. *Cf. Key Agency v. Continental Cas. Co.*, 31 N. J. 98, 105 (1959).

Thus we hold that "publicly assisted housing accommodation," as used in *N. J. S. A.* 18:25–4, is not limited in meaning to the instances set out in *N. J. S.'A.* 18:25–5(*k*), although those examples are illustrations of the general situations in which *N. J. S. A.* 18:25–4, insofar as it pertains to housing, is applicable. And it is not difficult to perceive that the developments in question fall into the class of housing described by the portion of *N. J. S. A.* 18:25–4 under consideration.

The statute plainly includes, as publicly assisted housing, housing projects such as those here involved as to which, at the time of the discrimination, an FHA insured loan is committed. *N. J. S. A.* 18:25–5(*k*). And the public assistance demonstrated by the federal insurance of such loans is much the same, under the circumstances of this case, as that demonstrated by an FHA commitment to insure housing loans. Just as ownership of housing and its concomitant benefits attributable to an FHA insured loan is said by the statute to be publicly assisted, by the same reasoning the advantages which accrue to the developers in question from the FHA commitments are plainly the result of public assistance. The very existence of the development can be attributed to the FHA commitment. The mass market opened by FHA and other government insured purchase money housing loans accounts for the prospect of sufficient buyers to purchase the housing in question. Without such a mass market, it is inconceivable that the developments would have been built; the number of prospective purchasers with adequate savings accumulated to make the downpayment required by conventional financing and with sufficient income to meet from

their income the payments on a conventionally financed debt would not warrant the mass housing construction in evidence today. Thus the very fact that there are houses with which to discriminate in the development in question is primarily attributable to public assistance. We need not here decide what are the outer limits of the term "publicly assisted housing accommodation." Suffice it to say that the public assistance rendered the housing here in question places it within the definition of that term as used in *N. J. S. A.* 18:25–4, and perhaps within *N. J. S. A.* 18:25–5(*k*).

### B.

The plaintiffs next argue that, even should their developments be construed to be publicly assisted housing, the DAD is without jurisdiction to hear the charges brought by the individual defendants inasmuch as the Legislature, while it established as a civil right access to publicly assisted housing, failed to give the DAD power over discrimination in any type of housing save that described in the first portion of *N. J. S. A.* 18:25–5(*k*). This argument runs as follows: The first New Jersey statutes forbidding discrimination in respect to housing were passed in 1950. *L.* 1950, *c.* 105 to *c.* 112, *N. J. S. A.* 55:14*A*–7.5, 39.1, 55:14*B*–5.1, 55:14*C*–7.1, 55:14*D*–6.1, 55:14*E*–7.1, 55:14*H*–9.1, 55:16–8.1. These related to housing built pursuant to *L.* 1949, *c.* 300, *N. J. S. A.* 55:14*A*–31 *et seq.; L.* 1941, *c.* 213, *N. J. S. A.* 55:14*C*–1 *et seq.; L.* 1944, *c.* 169, *N. J. S. A.* 55:14*D*–1 *et seq.; L.* 1949, *c.* 303, *N. J. S. A.* 55:14*H*–1 *et seq.; L.* 1938, *c.* 19, *N. J. S. A.* 55:14*A*–1 *et seq.; L.* 1938, *c.* 20, *N. J. S. A.* 55:14*B*–1 *et seq.; L.* 1946, *c.* 52, *N. J. S. A.* 55:14*E*–1 *et seq.;* and *L.* 1949, *c.* 184, *N. J. S. A.* 55:16–1 *et seq.* There existed uncertainty as to the mode of enforcement of the statutes passed in 1950, and as a consequence *N. J. S. A.* 18:25–9.1 was enacted. See the preamble to *L.* 1954, *c.* 198, and the Statement of Purpose accompanying *Senate Bill* 78 (1954). When *L.* 1957, *c.* 66 was adopted, amending *N. J.*

*S. A.* 18:25–4 to pertain to publicly assisted housing accommodations and adopting *N. J. S. A.* 18:25–5(*k*), *N. J. S. A.* 18:25–9.1 was left unchanged. Thus plaintiffs argue that the DAD has jurisdiction to act only on charges of discrimination in connection with housing referred to in the acts to which *L.* 1950, *c.* 105 to *c.* 112 were amendments. We think, however, that to adopt this argument would be to construe the statute in question too strictly. *N. J. S. A.* 18:25–9.1 states:

"The Division Against Discrimination in the State Department of Education shall enforce the laws of this State against discrimination in housing built with public funds or public assistance, *pursuant to any law*, because of race, religious principles, color, national origin or ancestry. The said laws shall be so enforced in the manner prescribed in the act to which this act is a supplement." *L.* 1954, *c.* 198, § 1. (Emphasis supplied)

The phrase "pursuant to any law" suggests that the Legislature had no intention of limiting the scope of the statute to any prior existing situations; rather, it intended that the procedures set out in the Law Against Discrimination be available to remedy any charge of unlawful discrimination in respect to housing. Even if the verb "built" be narrowly construed so that only houses constructed with public assistance, rather than houses constructed or owned by means of public assistance, *N. J. S. A.* 18:25–9.1 still applies to the developments in question. As we pointed out above, the housing with which we are concerned owes its existence to federally insured purchase money loans which create a mass market for consumption of the product produced by plaintiffs. There is no express provision in the statute providing that the public assistance be given directly to achieve the construction of the housing. And to construe public assistance as referring to indirect as well as direct help would seem to conform to the ends sought to be achieved by the Legislature by enacting the Law Against Discrimination. We hold, therefore, that *N. J. S. A.* 18:25–1 *et seq.* applies to the plaintiffs' developments in question.

## III.

The plaintiffs do not argue, and hence we do not decide, whether by restricting their ability to dispose of their property as they choose the statute in question violates due process. See *O'Meara v. Washington State Bd. Against Discrimination, No.* 535996 (*Super. Ct. King Cty., Washington State* 1959) (not officially reported); *Avins, Trade Regulations, Survey of the Law of New Jersey,* 1956–1957, 12 *Rutgers L. Rev.* 149, 150–160 (1957). But see *New York State Commission Against Discrimination v. Pelham Hall Apartments,* 10 *Misc.* 2d 334, 170 *N. Y. S.* 2d 750 (*Sup. Ct.* 1958); *Note,* 107 *U. Pa. L. Rev.* 515, 525–530 (1959); *Note,* 12 *Rutgers L. Rev.* 557, 558–567 (1958). There is ample support for a conclusion that lack of adequate housing for minority groups, an effect of discrimination in housing, causes crime-and disease-breeding slums. See *Berman v. Parker,* 348 *U. S.* 26, 33–34, 75 *S. Ct.* 98, 99 *L. Ed.* 27 (1954); *Crommett v. City of Portland,* 150 *Me.* 217, 107 *A.* 2d 841, 850 (*Sup. Jud. Ct.* 1953); *New York City Housing Authority v. Muller,* 270 *N. Y.* 333, 1 *N. E.* 2d 153, 154, 105 *A. L. R.* 905 (*Ct. App.* 1936); *City of Newark v. Charles Realty Co.,* 9 *N. J. Super.* 442, 453–456 (*Cty. Ct.* 1950). Freedom with regard to property is not inviolable; it is subject to the reasonable exercise of the Legislature's police power. *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926); *Block v. Hirsh,* 256 *U. S.* 135, 41 *S. Ct.* 458, 65 *L. Ed.* 865 (1921). The presumption is in favor of constitutionality, *Gibraltar Factors Corp. v. Slapo,* 23 *N. J.* 459, 463 (1957), and the burden of proof and persuasion is heavy on the party contesting the statute. In the absence of a showing of clear abuse of the police power, the tendency is to leave the wisdom of the statute as a political rather than judicial question. We may pass this question without decision, however, and proceed to consider matters briefed and argued by the parties.

## IV.

The plaintiffs argue that the Law Against Discrimination, by including within its purview only publicly assisted housing, creates an unreasonable and arbitrary classification in violation of the *Fourteenth Amendment* to the *United States Constitution* and the *New Jersey Constitution* 1947, *Article* I, *Section* 1. They argue that the relationship between the end towards which the statute is directed and the class to which it is applicable is not based on reasonable grounds. In other words, since the statute was intended to eliminate discrimination in housing, it must apply to housing generally, and since there is no difference between publicly assisted housing and housing generally insofar as the ability to discriminate or its effects are concerned, the distinction, and hence the statute, must fall.

As we indicated above, the presumption favors the constitutionality of the statute and it will be upheld unless facts judicially known or proved refute that presumption. *Clark v. Paul Gray, Inc.,* 306 *U. S.* 583, 594, 59 *S. Ct.* 744, 83 *L. Ed.* 1001 (1939) ; *Gibraltar Factors Corp. v. Slapo,* 23 *N. J.* 459, 463 (1957). The strong burden on the party attacking the constitutionality of a legislative classification (*New Jersey Restaurant Ass'n, Inc. v. Holderman,* 24 *N. J.* 295, 300 (1957)) has been expressed in various formulae. Thus, the classification will be sustained unless it causes invidious discrimination. *Morey v. Doud,* 354 *U. S.* 457, 463, 77 *S. Ct.* 1344, 1 *L. Ed.* 2d 1485 (1957) ; *Schmidt v. Board of Adjustment,* 9 *N. J.* 405, 418 (1952). The Legislature must only avoid arbitrary discrimination between persons similarly circumstanced. *Gundaker Central Motors, Inc. v. Gassert,* 23 *N. J.* 71, 80 (1957), appeal dismissed 354 *U. S.* 933, 77 *S. Ct.* 1397, 1 *L. Ed.* 2d 1533 (1958). But it is not sufficient to show that there are others equally guilty of the evil to be remedied to which the statute could have been made to apply. As was stated in *New Jersey Restaurant Ass'n, Inc. v. Holderman,* 24 *N. J.* 295, 300 (1957) :

"* * * It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. [citing cases] The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * * or because of 'some substantial consideration of public policy or convenience or the service of the general welfare.' * * * Hence it may 'stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact.' "

Considering the circumstances which led to the enactment of the statute in question, it becomes apparent that the classification presents no constitutional difficulties. We may note the pressing need for adequate housing for minority groups. Many more in these groups than at present would be in a position to take an active and beneficial role in the cultural, social and economic life of the community were they given an opportunity, and a vital factor in affording this opportunity is access to normal housing accommodations. The portion of the statute in question which relates to housing may be viewed as a means chosen to ease the housing problem facing minority groups. It may be argued that the main purpose is to secure some measure of adequate housing for minorities and only incidentally to this purpose is discrimination proscribed. The desired end may be achieved by legislating in regard only to a specific kind of housing. And the type of housing chosen is that most easily financed and as to which established patterns would least likely be disturbed. If these goals are not the intent of the Legislature, they do at least serve to demonstrate, insofar as they give a reasonable basis for the statutory classification, that the statute is not invalid on its face or palpably arbitrary. *Cf. Sage Stores Co. v. State of Kansas,* 323 *U. S.* 32, 35,

65 *S. Ct.* 9, 89 *L. Ed.* 25 (1944) ; *Jamouneau v. Harner,* 16 *N. J.* 500, 519–520 (1954), *certiorari* denied 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955) ; *Reingold v. Harper,* 6 *N. J.* 182, 194 (1951). In the absence of a showing of an actual injury to the plaintiffs, which was not attempted in the proofs, we cannot declare the legislation unconstitutional. Thus, the means chosen by the Legislature to accomplish its goals are not unreasonable, and on that basis we hold that plaintiffs' argument that the Law Against Discrimination incorporates an unconstitutional classification is without merit.

## V.

In their brief, plaintiffs make the argument that:

"The Law Against Discrimination, by singling out federally assisted housing for special regulation without providing for correlative regulations of all state assisted housing unconstitutionally discriminates against rights conferred by federal law."

The premise is that *N. J. S. A.* 18 :25–5 (*k*) is a definitive enumeration for purposes of the statute of all kinds of "publicly assisted housing accommodation" as used in *N. J. S. A.* 18 :25–4. As we held above, this notion is incorrect. And the whole argument must fall with the premise on which it is based.

## VI.

The plaintiffs next argue that the Law Against Discrimination invades a legislative field preempted by Congress and is for this reason invalid, citing *Commonwealth of Pennsylvania v. Nelson,* 350 *U. S.* 497, 76 *S. Ct.* 477, 100 *L. Ed.* 640, rehearing denied 351 *U. S.* 934, 76 *S. Ct.* 785, 100 *L. Ed.* 1462 (1956), and *Hill v. State of Florida,* 325 *U. S.* 538, 65 *S. Ct.* 1373, 89 *L. Ed.* 1782, rehearing denied 326 *U. S.* 804, 66 *S. Ct.* 11, 90 *L. Ed.* 489 (1945). Plaintiffs state that "Congress, as an integral part of its legislative program, determined not to prohibit discrimination in the sale or lease of FHA insured housing," and reason from this

is that any state law having that effect would violate congressional policy and the rule of preemption.

There is a considerable gap between Congress' refusing to adopt an express policy of non-discrimination in regard to FHA insured housing, to be applicable under all circumstances and in all sections of the country, and a congressional policy prohibiting states from enacting laws proscribing such discrimination. Congress did refuse to accept amendments to various versions of the National Housing Act which would have expressly prohibited the discrimination with which plaintiffs are charged. Comment, 59 *Colum. L. Rev.* 782, 784, *n.* 17 and text accompanying (1959). But to construe this action as establishing a congressional policy against state laws having the same effect is not warranted by the circumstances. Failure of Congress to incorporate in the National Housing Act a positive imposition of a policy of non-discrimination with its necessary national implications may be grounded in political expediency to secure its enactment and, in any event, such a provision would not account for local conditions and the effect of such a policy, on a local basis, on the national housing program. But state laws incorporating such a policy, taking into account and being expressly designed to meet purely local conditions and attitudes, are not subject to the same difficulty. Thus there appears reason why Congress might have rejected a non-discrimination amendment to the National Housing Act and yet not be opposed to state laws achieving the same result. It would be unsound, therefore, to conclude that the Law Against Discrimination ·invades a legislative area preempted by Congress.

## VII.

Finally, plaintiffs argue that the statute in question conflicts with the National Housing Act and hence is invalid under the supremacy clause of the *Federal Constitution, Article* VI, *paragraph* 2. Insofar as this argument rests on a supposed frustration by the Law Against Discrimination of a congressional policy of permitting discrim-

ination with respect to FHA insured housing, it is sufficient to point to our discussion of the argument concerning federal preemption, above, where we hold that Congress did not intend to exempt FHA insured housing from the operation of state laws prohibiting discrimination with respect to such housing. Unlike in *Johnson v. State of Maryland,* 254 *U. S.* 51, 41 *S. Ct.* 16, 65 *L. Ed.* 126 (1920); *Leslie Miller, Inc. v. State of Arkansas,* 352 *U. S.* 187, 77 *S. Ct.* 257, 1 *L. Ed.* 2d 231 (1956), and *Public Utilities Comm. of State of Cal. v. United States,* 355 *U. S.* 534, 78 *S. Ct.* 446, 2 *L. Ed.* 2d 470, rehearing denied 356 *U. S.* 925, 78 *S. Ct.* 713, 2 *L. Ed.* 2d 760 (1958), cited by plaintiffs as supporting their position, there is no conflict between state and federal power which might undermine the intent or purpose of the federal law or operation. *Cf. Stuyvesant Town, Inc. v. Ligham,* 17 *N. J.* 473, 486 (1955). Thus the statute creates no difficulties under *Article* VI, *paragraph* 2 of the *United States Constitution.*

## CONCLUSION.

We hold, therefore, that the public assistance rendered to the housing in question places it within the purview of the Law Against Discrimination and that the Division Against Discrimination in the State Department of Education has jurisdiction to hear and decide the charges brought against plaintiffs by the individual defendants, and that the statute on which the jurisdiction is based is valid. Thus the relief sought by plaintiffs in their action in lieu of prerogative writs cannot be granted, and the cause must be returned to the Division Against Discrimination in the State Department of Education for disposition. The judgments appealed from are affirmed.

*For affirmance*—Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.