LINMARK ASSOCIATES, INC., and William Mellman, Plaintiffs-Appellees,

v.

The TOWNSHIP OF WILLINGBORO and Gerald Daly, Defendants-Appellants.

No. 75–1448.

United States Court of Appeals, Third Circuit.

Argued Oct. 31, 1975.

Decided April 28, 1976.

788

Myron H. Gottlieb, Kessler, Tutek and Gottlieb, Bordentown, N. J., for defendants-appellants.

John P. Hauch, Jr., Archer, Greiner & Read, Haddonfield, N. J., for plaintiffs-appellees.

Before GIBBONS, Circuit Judge, MARKEY,[*] Chief Judge of Court of Customs and Patent Appeals and WEIS, Circuit Judge.

## OPINION OF THE COURT

MARKEY, Chief Judge, Court of Customs and Patent Appeals.

Linmark Associates, Inc. (Linmark), a New Jersey corporation of Camden, New Jersey and owner of residential premises at 25 Sherwood Drive, in the Township of Willingboro, New Jersey (Willingboro) and William Mellman (Mellman) of Mellman Realtors of Cinnaminson, New Jersey, Linmark's real estate broker, challenged the constitutionality of a Willingboro ordinance which barred the erection of "For Sale" and "Sold" signs on residential properties. The complaint charged the ordinance as unconstitutional because it deprives plaintiffs of their right of free speech under the First and Fourteenth Amendments, deprives plaintiffs of their property without due process of law in violation of the Fifth and Fourteenth Amendments, discriminates against plaintiffs and denies them due process and equal protection under the Fourteenth Amendment, denies plaintiffs their right to freely acquire and alienate property under the Ninth and Fourteenth Amendments, bears no relationship to public health, safety and welfare, is in derogation of the police power, is an abuse of its enabling legislation, denies Mellman his right to do lawful business in violation of the Ninth and Fourteenth Amendment and is overbroad. After a nonjury trial, the district court held the ordinance to be an abridgement of the First Amendment's free speech guarantee and an infringement on "the fundamental right to travel." Because we cannot find support in the record for the district court's legal conclusions, we reverse.

### Historical Background

Residential development of Willingboro from the late 1950's is attributed chiefly to Levitt and Sons, Inc., which built moderately priced homes for middle income families. Development, now virtually complete, proceeded through the "part system" whereby ten distinct areas (parts) were sequentially developed. In the early stages, Levitt refused to sell its houses to minority group members. The New Jersey Supreme Court enjoined that racially based housing discrimination. *Levitt and Sons, Inc. v. Division Against Discrimination in State Department of Education,* 31 N.J. 514, 158 A.2d 177, appeal dism., 363 U.S. 418, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960).

Thereafter, a Human Relations Commission was formed and development of the community with full racial integration was actively encouraged. The Township joined National Neighbors, a nationwide organization promoting integrated housing and advising on what can be done to overcome discriminatory housing practices. As a result, a close approach was achieved to that housing ideal sought by fair-minded citizens, mandated by the federal Fair Housing Act, 42 U.S.C. § 3604, and impelled by our Constitution. Willingboro became a racially open community, with each of its ten "parts" having all racial and ethnic groups living together, with no section which could be denominated a white section, a black section, or a Spanish-speaking section. Between 1970 and 1973, the nonwhite population increased by 60% and had risen, without the formation of a racially segregated area or "ghetto," from about 12% to about 18% of the total population.[1] During those

---

[*] Sitting by designation.

1. The instance of stable, integrated racial patterns is rare. *Twenty Years After Brown—Equal Opportunity in Housing,* Report of the United States Commission on Civil Rights, Dec., 1975, p. 9. The success of Willingboro in achieving a continued integration pattern as its non-white population increased by 60% may be compared with the national experience wherein the black proportion of suburban populations has remained steady at 5% since 1950. *Id.* at 123. Racial segregation within central cities has been the norm and has been on the increase, while the number of black persons in mixed neighborhoods has declined. *Id.* at 124. When black persons have moved to suburban neighborhoods, those neighborhoods have frequently become black enclaves. *Id.* at 119.

same years, within the total population of 45,000, there had been a decrease of about 2,000 in the white population and an increase of 3,000 in the nonwhite population.

Historically, the Willingboro population has been transient due to the nearness of military installations and the nature of the people's employment. Eighty-two realtors, members of the Multiple Listing Service of Burlington County (MLS), were competing in the sale of houses in Willingboro. These conditions, and the uniformity in home construction,[2] made it possible for a number of "For Sale" and "Sold" signs in a limited area to create the impression that many people were leaving the community. A fear psychology developed among home owners, which Council member and former Mayor W. J. Kearns, Jr. characterized in his trial testimony as follows:

> * * * I think that the concern that was generally expressed was that people in the community were expressing a desire to sell their homes and move to other areas of Burlington County because what they sensed was a lack of stability or a large turnover in the community, and that this large turnover was resulting in a substantial influx of minority groups into the community beyond what could be sustained without the community itself turning into a ghetto within the county.
>
> * * * * * *
>
> I think most of us in the official level, and most of the citizens who were concerned about it that I talked to, felt that this was an irrational reaction on the part of many people, and that we were dealing with a psychological problem that we had to find some way to give people the feeling of stability so they would not over-react to a particular situation.
>
> I don't think anyone was concerned with people of minority groups moving into the community or reaching a 20 percent, or even somewhere in the range of 20 to 25 percent minority grouping. They felt this was properly a generally

[sic] average throughout the Delaware Valley area.

> But they did not feel that if we had a situation where white home owners in the community were moving, not because they were transferred or not to move to a larger home or a smaller home, for other economic reasons, but were moving because what they sensed was the reaction of the community, but that we would wind up with Willingboro hitting beyond the point of minority group population that would turn it into an isolated pocket of minority groups in Burlington County. It would no longer reflect an integrated community, but would become a ghetto.

Concern for the preservation of the well-integrated character of the community and the desire to counteract the growing fear psychology produced a public sentiment against "For Sale" and "Sold" signs on residential property. Responding to that sentiment, the township council investigated the approach of other cities. At the trial, Mayor Kearn stated the results of the investigation into Shaker Heights, Ohio's experience to have been:

> They indicated that at the outset there was a strong hostility to their ordinance on the part of the realtors. But that after having worked with it for a year, to a year and a half, that they found they have good compliance, and that it was working very successfully.

The Township council consulted the Willingboro Human Relations Commission for its views and recommendations. The response was described at the trial by Mrs. Gladfelter, a founder-member of the Commission and its chairperson in 1973–74:

> Yes, I think we specifically were recommending at this time that council move to consider an ordinance or any other possible way to prohibit sale and sold signs throughout the township.

The concern of the Commission was described at the trial by Commission member Alexander W. Porter as follows:

> constructed on lots having 60–70 foot street frontage.

---

**2.** Typical Willingboro dwellings were built in a line, the same distance from the street, and

I think the Commission would like to see a community which is as harmonious as it would choose to be without the kind of pressures, if I may use that term, which would induce people to sell when in fact they don't want to sell; and I think that's the thing that the ordinance was directed at.

Individuals were responding and reacting to a rash of signs, or, one sign which would lead to another, and another and another.

I think that's the concern the Commission was trying to address.

Public concern with the effect of "For Sale" and "Sold" signs had become widespread in 1972 and became an issue in the 1973 elections to membership on the Township Council. The Council's normal policy was to hold one public meeting after an ordinance had been drafted and before its adoption. With respect to the signs, however, after two years of public ferment, the Council conducted two public hearings, one before (February 4, 1974) and one after (March 18, 1974) the drafting of the ordinance herein. More than 50 citizens presented their views during the more than four hours devoted exclusively to the question of the signs on residential property. Complaints were stated regarding phone calls, letters and house-to-house solicitations by realtors inquiring whether the home-owner wished to sell; [3] about panic selling; about "Sold" signs remaining up for six weeks in violation of an ordinance requiring their removal in five days (in response to which Council members cited the great difficulty of enforcement); about the "forest" of signs, which created the impression that "there was something wrong with the community," and consequent departure of persons who might otherwise have remained. Realtors and representatives of real estate brokers were the main spokesmen against the ordinance, describing the signs as "tools" needed in their business. Some realtors injected race questions in their arguments against the ordinance. One realtor questioned whether the council had funds to defend the ordinance in litigation.

■ At the end of the second public hearing, the ordinance, which took the form of an amendment to a prior ordinance and prohibited posting of "For Sale" and "Sold" signs on residential property other than model homes, was adopted unanimously by the Township Council, Mayor Kalik abstaining because she considered her status as a realtor raised a conflict of interest. The minutes of both public hearings, plus those of the Council meeting which adopted the ordinance and at which the Council members explained the reasons for their vote, were transcribed and made an exhibit (P–3) at the trial.[4]

---

3. The effect of signs and solicitation to sell, the subtleties employed by marauding blockbusters and the difficulty of stemming their actions before the "tipping" point is reached—after which the process is irreversible—are all described in Note, "Blockbusting," 59 *Geo.L.J.* 170 (1970). See, also, Comment, "Blockbusting: Judicial and Legislative Response to Real Estate Dealers' Excesses," 22 De Paul L.Rev. 818 (1973); "Blockbusting: A Novel Statutory Approach to an Increasingly Serious Problem," 7 Colum.J.L. & Soc.Prob. 538 (1971); State court decisions are collected in Comment, "The Constitutionality of a Municipal Ordinance Prohibiting 'For Sale,' 'Sold,' or 'Open' Signs to Prevent Blockbusting," 14 St.L.M.L.J. 686 (1970).

4. Exhibit P–3 was initially submitted by the Township in connection with a motion. At trial opening, plaintiffs' counsel stated:

"I think these would be offered in the nature of a joint exhibit. It's agreed that they do accurately reflect what was said at the meetings on the subject. However, the truthfulness of the statements is not admitted, but the fact that they were made is."

The dissent would appear to rest substantially on acceptance of the truth of selected statements made at the public hearings. The same is true of the decision below.

Of course, Exhibit P–3 can stand only for the fact that the statements, mostly argumentative and none subject to cross-examination, were made. Except for three minor references, Exhibit P–3 was ignored at the two day trial herein.

As said in *Construction Industry Ass'n., Sonoma City v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975) we are not a "super legislature" and are not authorized to "weigh and reappraise the factors considered or ignored by the legislative body."

*Proceedings Below*

Suit was filed four months after the ordinance was adopted. One witness, Mellman, testified on plaintiff's side. His direct testimony consisted only in the statement that the nonavailability of a sign slowed the sale of the residential property of co-plaintiff Linmark Associates, Inc.; that he had had complaints from Linmark, as well as from other (unnamed) homeowners, regarding slowness in furnishing buyers and saying, "Why don't you put a sign up?"; and that an average of 30% of his inquiries had resulted from signs over many years. Mellman did not state that the ordinance caused him any actual or specific loss of sales or commissions. After the cross-examination

5. After describing the parties, the ordinance, the town, and the positions of the parties, the remainder of the opinion of the district court herein in its entirety reads:

An ordinance of the city of Gary, Indiana which prohibited the display of "For Sale", "Sold", or similar signs in residential areas was upheld as reasonable where it was clearly apparent that the proliferation of the "For Sale" signs resulted in a tendency to provoke panic selling. *Barrick Realty, Inc. v. City of Gary, Indiana*, 354 F.Supp. 126 (N.D.Ind. 1973), *affirmed* 491 F.2d 161 (7th Cir. 1974). The Court stated:

"The potential public benefit from the ordinance far outweighs the harm to realtors and homeowners who wish to use 'for sale' signs. The additional expense or delay which might result from having to use alternative means of advertising is minimal." 354 F.Supp. at 136.

Thus, an ordinance similar to the one in question here has been held to be a reasonable exercise of the police power. However, the history of the Gary ordinance shows that its purpose was to halt resegregation.

"It was passed in response to the presence of numerous 'For Sale' signs in some white neighborhoods, which caused whites to move *en masse* and blacks to replace them. There is evidence in the record that some real estate brokers who placed these signs (not including any plaintiffs) actively encouraged resegregation by unlawfully urging whites to sell quickly before they had black neighbors and lower property values." 491 F.2d at 163.

With due deference to the reasoning of the *Barrick* court, on the facts before the court there, it appears that the true thrust of these sign ordinances is to promote a racial balance or more properly, a racial imbalance in order to perpetuate existing racial lines.

of Mellman, plaintiff rested. Defendant moved for dismissal for failure of plaintiffs to carry their burden. Decision was reserved, but the motion was never again mentioned, perhaps because defendant had indicated, prior to its motion, that plaintiffs' counsel intended to rely on "evidentiary proofs presented by defense."

Defendant presented seven witnesses, Councilmen Kearns and Heath, Human Relations Commission members Gladfelter and Porter, Human Relations Commission Chairman Rev. Ernest Shaw Lyght, and real estate agents Evans and Connolly.

Because of its laudable brevity and its relation to an understanding of our decision herein, the opinion of the district court is presented in the margin.[5]

There can be no doubt that this is precisely the result desired by the Willingboro Town Council in adopting this ordinance. However, the key distinction between Willingboro and Gary, Indiana is that in Gary the stimulus and response were easily observable. As "For Sale" signs appeared, whites disappeared from the city *en masse*. Yet in Willingboro, there exists no evidence of similar patterns. Rather, there is merely an indication that its residents are concerned that there may be a large influx of minority groups moving in to the town with the resultant effect being a reduction in property values. This fear of declining property values, however, although very real to property owners in Willingboro, is not and cannot be the concern of this court when it results in an abridgement of constitutional rights.

In spite of its decision, the Seventh Circuit in *Barrick* recognized that "The very purpose of the ordinance is censorial. First Amendment as well as commercial interests are therefore affected by this ordinance." 491 F.2d 161 at 164.

The Supreme Court has held that reasonable regulations upon commercial communications do not fall within the purview of the First Amendment. *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). The situation, however, with which the court is presented here results in nothing less than censorship by denying property owners of a very important means by which they may communicate to others that their property is for sale. In light of testimony from plaintiff Mellman that approximately thirty percent of inquiries to his office are a result of "For Sale" signs being posted on residences, it is apparent that the ordinance brings about a serious denial of a property owners right to freely and reasonably express to others the desire to sell in violation of the First Amendment.

## Issues

We are called upon to decide whether the district court erred in striking down the ordinance as (1) violative of the First Amendment guarantee of free speech, and (2) as an infringement of the right to travel.

## Burden of Proof

■ Acts of legislative bodies, state and municipal, are presumed to be in harmony with the Constitution. See *Erb v. Morasch*, 177 U.S. 584, 20 S.Ct. 819, 44 L.Ed. 897 (1900). The present ordinance on its face constitutes some limitation on the right of free speech. In view of the "privileged position" of the First Amendment, therefore, we must review the nature of the

Even more important is the concomitant result: one who wishes to purchase a home in Willingboro has no way of learning what is available. He only has the "option" of choosing a home from those which he is shown by a realtor, thereby necessitating the use of a real estate brokerage firm. Further, the broker or salesman may be very selective in choosing which home he wishes to show a potential buyer. This fact along with the purported "purpose of the ordinance—'stabilization of neighborhoods'—may have the ultimate effect of freezing in past discrimination, denying blacks a fair opportunity to find suitable housing." *DeKalb Real Estate Board, supra.*

Thus, this circumstance leads to the natural conclusion that in its application the Willingboro ordinance results in an infringement upon the fundamental right to travel, *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), a right which may not be abridged absent a compelling State interest. *Wellford v. Battaglia*, 343 F.Supp. 143 (D.Del. 1972), *affirmed* 485 F.2d 1151 (3d Cir. 1973). Travel, in this sense, refers to migration with intent to settle and abide, not mere movement. *Wellford, supra*, 343 F.Supp. 143, 147 n.9.

Yet in view of the opportunity that realtors in Willingboro have to utilize the ordinance to arbitrarily regulate the racial and ethnic development of a particular residential area, there is abundant evidence of potential interference with the right to travel, a right which applies to intrastate as well as interstate migration. Id. at 147.

Although municipal ordinances are clothed with a presumption of validity, *Roe v. Kervick*, 42 N.J. 191, 199 A.2d 834 (1964), the exercise of a municipality's police power in enacting an ordinance must be through reasonable means substantially connected with the public interest

message censored, the purpose and effect of the ordinance, and its relation to the public welfare as an exercise of the police power.

■ To defeat the ordinance on due process grounds under other constitutional provisions, however, Linmark and Mellman must establish, at least prima facie, that the ordinance is so unreasonable and arbitrary as to amount to an impermissible infringement on constitutional guarantees. *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1960); *New Orleans Public Service, Inc. v. New Orleans*, 281 U.S. 682, 50 S.Ct. 449, 74 L.Ed. 1115 (1930).

■ This action was brought by two business-oriented plaintiffs, whose interest in Willingboro lies in the profit to be derived from sales of real property in the community.[6] Linmark desired a faster sale designed to be advanced *Moyant v. Paramus*, 30 N.J. 528, 154 A.2d 9 (1959).

Although this court does not doubt that Willingboro adopted its ordinance for what the Town Council felt was a valid purpose, legitimate legislative goals cannot be pursued by means which broadly stifle fundamental liberty when the end can be more narrowly achieved. *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

The goal here of alleviating problems of panic selling is meritorious. However, the means employed are not. Therefore, the ordinance must not be allowed to stand when as applied, it enables a realtor, a private citizen, to be the only one capable of apprising a potential buyer of the status of the real estate market. It is he alone who is aware of those homes which are listed for sale. The buyer is forced to seek him out, no longer being able to merely assess a particular residential area in a community to ascertain for himself the homes which are available. What follows is to place each purchaser at the whim of the realtor, enabling him, if he so desires, to stimulate and prey on racial bigotry and fear to create or perpetuate ghettos.

Such a result, accomplished through the action of a municipal governing body, cannot be tolerated. This court, following a full hearing, therefore determines Ordinance No. 5–1974 of Willingboro Revised General Ordinances to be unconstitutional.

Plaintiff will submit an appropriate order. Dated: February 20th, 1975

6. No witness testified against the ordinance on racial discrimination grounds. On the contrary, the testimony showed the support of the ordinance on the part of a number of organizations devoted to the civil rights of black citi-

of 25 Sherwood Drive. Mellman's sales commissions are earned only by turnovers in property ownership. Municipalities have a bona fide interest in regulation of commercial activities in residential areas. That community interest may, in a proper case, prevail over a claim of economic loss. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The plaintiff's case in chief involved a single witness, the realtor Mellman, whose limited testimony on direct is described above. Cross-examination of Willingboro's witnesses did not satisfy the burden of proof on the due process issue or even of economic loss.[7]

Accordingly, the district court elected to rest its decision on free speech and right to travel considerations, concluding that the purpose of the ordinance was to maintain a racial imbalance and citing a suspicion that realtors might discriminate as support for its conclusions with respect to both free speech and the right to travel.

■ Review of the district court's conclusions does not require resolution of witness credibility or of conflicting factual testimony at the trial. We have, of course, considered the entire record in relation to the purpose of the council in adopting the ordinance, and in relation to the effect of the ordinance. Similarly, though the right to travel was never mentioned at trial or in the briefs below, and though plaintiffs had no standing to raise that third-party interest, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Construction*

*Ind. Ass'n., Sonoma Co. v. City of Petaluma, supra,* note 4, at 903, we have considered that question as well. As discussed more fully below, we cannot find wherein the record supports the district court's conclusions concerning the constitutionality of the ordinance.

### Free Speech

■ Every anti-sign ordinance infringes to some extent upon some form of speech or type of message. If the ordinance herein had impeded "pure speech" its demise would have been certain. There is, however, a well recognized distinction between commercial advertisement and the advertisement of opinion, information and ideas. See *United States v. Hunter,* 459 F.2d 205 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), *reh. denied* 413 U.S. 923, 93 S.Ct. 3046, 37 L.Ed.2d 1045 (1973), and authorities collected therein. If, as seems clear, the present ordinance impeded speech primarily commercial, and the noncommercial portion of the message does not comprise comment on or protest of political or social policies or like elements of pure speech, the ordinance may be sustained by the public interest it serves.

Though signs in general convey a message or a thought, they do not always consist solely of "pure speech." A "For Sale" sign on a residence states the owner's and the realtor's commercial desire to sell that residence. A "Sold" sign states the com-

zens. The district court accepted Councilman Heath's statement that the N.A.A.C.P. was "among the strongest proponents" of the ordinance.

That plaintiffs do not claim to be the victims of racial discrimination would not, of itself, save the ordinance, if it had been shown to have the purpose or effect of racial discrimination.

7. That the absence of signs results in economic loss was left by plaintiffs to inference. In cross-examination, plaintiff's counsel established that the same number of houses were being *sold* (and thus that the same commissions were being earned). He then brought out the increase in the particular volume of defendant's two realtor witnesses, implying an undercurrent of in-town realtors vs. out-of-town real-

tors. Evans had earlier stated that "community assessment" expressed to him by homesellers included a belief by the homesellers that non-MLS realtors from out of town were bringing in minority groups. But there was no evidence that out-of-town realtors had lost any sales. The increases of Evans and Connolly could have equally implied a decrease by other in-town realtors among the 80 other members of the MLS. Evans "believed" most of his increase came from "March Realty," which was not otherwise identified at trial. Moreover, plaintiff Mellman was himself a member of the Multiple Listing Service operating in Willingboro and had worked together with defendant's witness Evans, who described Mellman, without contradiction, as "one of the prime movers of my properties."

mercial fact that the residence has been sold. The present signs thus incorporate a substantial "nonspeech" element. In *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed. 672, 679 (1968), the Chief Justice stated:

> This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.

■ The present ordinance does not attempt to dictate or regulate the content of permitted signs, it forbids particular signs altogether in a particular area, i. e., it limits the location of the involved signs, leaving other means available for conveyance of their content.[8] Our scrutiny, nonetheless, impels consideration of whatever message may reside in the signs. Though the message of the signs before us is primarily a commercial message, it is clear that a "For Sale" sign necessarily includes an additional message, i. e., "The owner is leaving this residence," and a "Sold" sign includes the message, "The owner has left this residence." We are unable to detect, and nothing in the record speaks of,[9] any other possible message in "For Sale" and "Sold" signs on residential property. As appears hereinbelow, we consider the limitation on the manner whereby and the place wherein both messages may be conveyed to have been based on a paramount governmental public interest, to wit the termination of a panic selling psychology and its impetus to housing segregation. Stated another way, we conclude that the manner and place limitation on commercial speech herein

served a legitimate public welfare interest and the incidental manner and place limitation on noncommercial speech falls upon an unspoken or invisible "message" or communication of a nature insufficient to override that public interest on First Amendment grounds.

■ That a communication is commercial in nature does not *ipso facto* strip the communication of its First Amendment protections.[10] There is no "exception" which exempts a limitation on commercial communications, or "advertising," from constitutional scrutiny. That a communication is commercial does, however, permit municipalities to weigh the impact on the general public of the manner in which the communication is made. And if that impact be found detrimental, and the limitation on any pure speech element be found minimal, the manner in which communication is made may be regulated. *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).

*Chrestensen* was characterized in *Bigelow v. Virginia*, 421 U.S. 809, 819, 95 S.Ct. 2222, 2231, 44 L.Ed.2d 600, 610 (1975), as follows:

> But the holding [in Chrestensen] is distinctly a limited one: *the ordinance was upheld as a reasonable regulation of the manner in which commercial advertising could be distributed.* The fact that it had the effect of banning a particular handbill does not mean that *Chrestensen* is authority for the proposition that all statutes regulating commercial advertising are immune from constitutional challenge. The case obviously does not support any sweeping proposition that advertising is unprotected *per se*. [Emphasis added and footnote omitted].

---

**8.** In *Terminal-Hudson Electronics of Calif. v. Dept. of Consumer Affairs*, 407 F.Supp. 1075, a three-judge court (D.C.C.Calif.) struck down a code provision prohibiting all advertising of the cost of commodities and services of optometrists, because the provision permitted no other means by which comparative price information could be obtained.

**9.** There was no testimony below, and no exhibit, relating to the nature of the message being censored by the ordinance herein.

**10.** Although one author may consider the exaltation of momentary, sterile, commercial exchange transactions, by equating them to the majestic status of the First Amendment, to be unwise: "Those who constantly press the Supreme Court to stand up and face every issue squarely may have lost sight of the utility of softening our edges to keep them from cutting us apart." Karst, *Community and Law*, Law and the American Future, American Assembly, 1976.

The advertisement banned by the state in *Bigelow* appeared in a Virginia newspaper and was for abortion services in New York. The court noted that Virginia could neither regulate the advertiser's legal services in New York nor prevent Virginians from traveling to New York to avail themselves of those services. Because the Virginia courts were found to have erred in their assumption that *no* First Amendment protection attaches to advertising, the Supreme Court found it unnecessary to decide the precise extent to which advertising may be regulated. The court then commented:

Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. See *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations.*

In *Pittsburgh Press*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669, *reh. den.* 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128 (1973), a city ordinance forbidding sex classification in newspaper employment advertising was held not to infringe First Amendment rights. Although the dissenting opinions in *Pittsburgh Press* were critical of *Chrestensen*, the majority relied on that opinion and compared it with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as follows:

The critical feature of the advertisement in *Valentine v. Chrestensen* was that, in the Court's view, it did no more than propose a commercial transaction, the sale of admission to a submarine. In *New York Times Co. v. Sullivan*, Mr. Justice Brennan, for the Court, found the *Chrestensen* advertisement easily distinguishable:

The publication here was not a "commercial" advertisement in the sense in which the word was used in *Chrestensen*. It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives

are matters of the highest public interest and concern. 376 U.S., at 266 [84 S.Ct., at 718, 11 L.Ed.2d, at 698].

In the crucial respects, the advertisements in the present record resemble the *Chrestensen* rather than the *Sullivan* advertisement. None expresses a position on whether, as a matter of social policy, certain positions ought to be filled by members of one or the other sex, nor does any of them criticize the Ordinance or the Commission's enforcement practices. Each is no more than a proposal of possible employment. The advertisements are thus classic examples of commercial speech.

■■■ So here, in all crucial respects, the "For Sale" and "Sold" signs in themselves resemble *Chrestensen* rather than *Sullivan* subject matter. The visible message of a "For Sale" sign is a proposal of a commercial transaction, the sale of a residence. The visible message of a "Sold" sign is an advertisement that a sale transaction has been completed.[11] Neither, in itself, contains comment on social policy, grievances, abuses, criticisms, or the like.[12]

Though the speech herein be primarily commercial, our duty remains one of balancing the governmental interest involved against the precise limitation imposed. As expressed by the Supreme Court in *Bigelow*:

a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation.

■■■ The preservation of a desirable community impels a priority of the community's needs over the needs of those who would conduct commercial transactions in the community as they see fit, so long as those community needs are reasonably established and the means chosen to meet them do not infringe upon the fundamental constitutional rights of individual business-

---

11. To prohibit only "Sold" signs could result in the conveyance of an impression that houses were on sale but could not be sold.

12. We consider, *post,* the "invisible" message, i. e., that people are leaving.

men. That the present ordinance denies homeowner-sellers and realtors the freedom to continue the use of a particular sales tool is clear, but not fatal. Nor is it new. Constitutionally affirmed laws abound that limit business practices. Nor does the record support the district court's characterization of the denial as "serious." It's effect on plaintiffs is, at most, to slow the pace of sales on the 30% of inquiries received from signs to that of the other 70% received from other sources. Newspaper ads, in-town window displays or other possible means of conveying the desire to sell remain fully available to all. Houses will still be sold, though perhaps not as quickly. Most importantly, fewer may be sold solely because the seller had a fear of minorities. We consider the limited denial occasioned by the ordinance herein to result from a reasonable exercise of the police power in furthering the public welfare by forestalling panic selling and its offspring, segregation.

Linmark and Mellman argue that the governmental interest herein is inadequate. We are persuaded, however, that the concept of the public welfare is of sufficient breadth to uphold the Township's interest in protecting its stable, racially integrated neighborhoods from the destructive segregating effect of a panic selling psychology, and that that Township interest is sufficient to justify a prohibition of "For Sale" and "Sold" signs, the physical embodiments of plaintiffs' commercial speech, on residential property.[13]

*Purpose of the Ordinance*

■ Nothing in the record indicates that the thrust of the present ordinance was the maintenance of a racial balance or imbalance, or that such was the desire of the Council. And nothing of record indicates that "preserving stability" is equatable herein to "racial discrimination" or to the maintenance of a given numerical ratio of white to nonwhite persons in the community. Only by refusing to sell to a minority buyer anywhere in Willingboro, could any set population ratio of Willingboro be maintained. "Stability" herein, as the record shows, means diminution of the number of neighbors leaving on the basis of fear alone. See *Brown v. State Realty Co.,* 304 F.Supp. 1236, 1238 (N.D.Ga.1969). Obviously, the absence of signs could not itself control who moves in.[14]

13. There was testimony that the signs herein were unsightly. Aesthetics are governmental interests which have supported limitations on full-force application of the First Amendment to outdoor commercial advertising, *St. Louis Poster Advertising Co. v. St. Louis,* 249 U.S. 269, 39 S.Ct. 274, 63 L.Ed. 599 (1919); *United Advertising Corp. v. Borough of Raritan,* 11 N.J. 144, 93 A.2d 362 (1952). There was also testimony establishing the difficulty of controlling "Sold" signs. It is clear, however, that the primary public interest sought to be served herein was the forestalling of panic selling and its attendant evils.

14. Though the present ordinance was not designed to achieve racial balance, there is substantial indication that such general purpose would support, rather than destroy, the ordinance. The thrust in site selection for subsidized housing for low income groups is *racially balanced* tenancy. See, *Fair Housing and Exclusionary Land Use,* Report of National Commission Against Discrimination in Housing and Urban Land Institute (1974), cited in *Twenty Years After Brown,* supra, note 1, p. 94. In *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2nd Cir. 1973), it was held that the housing authority's duty to *racially balance*

housing took precedence. In *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the Supreme Court, citing *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 said:

It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.

See also, *Oakwood at Madison, Inc. v. Madison,* 117 N.J.Super. 11, 283 A.2d 353 (1971), in which the court invalidated a zoning ordinance that failed to promote a reasonably balanced community in accordance with the general welfare.

The difficulties of social engineering, in governmental efforts to achieve racial harmony, and the agonizing conflict between the desire for integrated communities and the concommitant necessity of denying residence to a minority in a particular area beyond a planned number in designing such a community, are described in Frederick, "The Legality of Affirmative Measures to Achieve and Maintain Integration in a New Town," 59 *Geo.L.J.* 335 (1970).

▮ That the purpose of the ordinance and of the Council was to nip panic selling in the bud, and not to preserve any particular numerical racial balance, was undisputed and was illuminated at the trial by every witness to whom the question was put.[15] For example, the Chairman of the Commission, the Rev. Ernest S. Lyght, after stating that there was currently no overt racial conflict but that underlying racial conflicts remained, was asked:

Q. So that the enactment of the ordinance prohibiting for sale signs didn't entirely solve the problem; is that what you are saying?

A. No. And there was no intent on the part of the Commission in making such a recommendation. There was no thought that this was going to somehow solve all racial problems. But it was felt that this was one approach, one aspect of dealing with overall problems, specifically to deal with this matter of creating panic selling, which we have clearly realized could cause a change, see, in the racial balance of the community.

THE COURT: Do you concern yourselves with such things as balance; and do you mean, for instance, an 80/20 ratio is necessarily a balance?

THE WITNESS: No concern with ratios, absolutely none. Simply the openness and ability to live in the community and anywhere in the community one chooses. No concern with ratios.

BY MR. GOTTLIEB:

Q. So when you use the term "balance," it doesn't have a numerical connotation?

A. No, and probably I shouldn't say balance, but should say complete, total openness.

Q. Is it your impression that the enactment of the ordinance prohibiting for sale signs has in any way caused a lessening or a decrease in the areas of racial or ethnic conflict in the township?

A. I think my specific response would have to be that it's fairly clear to me that the prohibition has stopped or brought to an end the kind of things that we used to hear of, people talking about the rapid change in the community, whether it was in fact or assumed.

Commission member A. W. Porter similarly testified:

If the neighborhood was or is to be all black, and if that is a decision by choice, choice of the individuals involved, then the Commission I believe would have no concerns about that. But if neighbors, residents of the township are being pushed into this kind of thing by the presence of a sign or signs, then I think the Commission's concern would be that that ought not to be, this is not the free choice that people ought to exercise, should exercise.

Councilman Kearns testified:

Q. Now, you said that you, as a councilman and former mayor, were not concerned with minority groups in the community reaching a level of perhaps 20 to 25 percent of the total population; correct?

A. That's correct.

\* \* \* \* \* \*

Q. In your discussion in council, was it ever your feeling that council was utilizing this ordinance to restrict minority groups from moving into town?

A. Absolutely not.

---

15. No part of Evans' testimony established a discriminatory desire in him. Nor could his personal views be attributed to the Township Council. The full testimony of Evans establishes that his reference to "80/20" involved only *his own sales,* which had not changed in the short four months since passage of the ordinance, and that he "had no way of guessing" what the "overall percentage of minority groups in Willingboro" was. Evans' view that an 80/20 ratio represents "stability," even if that view were somehow evil (in the absence of acts to maintain any set ratio) would not be binding on the Council or constitute evidence of the *Council's* purpose in enacting the ordinance. Evans was not on the Council and did not make policy for Willingboro. Plaintiffs' counsel objected, properly, to Evans' answering a question as to whether "conditions in the community [were] sufficient to warrant the ordinance."

Q. Blacks, Spanish persons, what-have-you?

A. Absolutely not. We were trying to prevent the emotional reaction on the part of sellers. It was in no way related to people moving into the community.

Councilman Heath:

Q. Now, I understand that the percentage of minorities in the community, however, had been increased; is that correct?

A. That's correct.

Q. But your township exhibit shows that it's eighteen percent now; and to you, does that represent an unstable condition or a stable condition?

A. I don't think it's sufficient information to pass a judgment as to stability or instability. You know, simply—the simple figures.

Q. Does it cause you great concern?

A. Does it cause me concern?

Q. Yes.

A. Personally because there are blacks in Willingboro, no. Would it cause me concern that I felt that large number of people were panic-selling? Yes. Be they black or white, and be blacks or whites moving in.

\* \* \* \* \* \*

A. Do I think that simply have [sic] the 18.2 percent of our people black presents an unstable position?

Q. Yes.

A. No.

Q. Is there anything on that chart that you think represents an unstable condition or an imbalance of what you think the population ratio should be in Willingboro?

A. I think they are two different questions. If I could answer one, there is nothing on here that causes me to think, looking at the statistics, that it's unstable. In answer to question number one.

In answer to question number two, I have no preconceived notion as to what the percentages of people ought to be.

The public interest that lies in avoidance of the psychological climate leading to panic selling, and its resultant impetus to housing segregation, was, as the district court herein recognized, referred to by the court in *Barrick Realty, Inc. v. City of Gary, Indiana,* 491 F.2d 161 (7th Cir. 1974) in these terms:

The history of the ordinance banning "For Sale" signs shows that it was aimed at panic selling and that its purpose was to halt resegregation. It was passed in response to the presence of numerous "For Sale" signs in some white neighborhoods, which caused whites to move *en masse* and blacks to replace them. There is evidence in the record that some real estate brokers who placed these signs (not including any plaintiffs) actively encouraged resegregation by unlawfully urging whites to sell quickly before they had black neighbors and lower property values. Plaintiffs' signs proposed a commercial transaction that is part of a pattern of transactions, all of which taken together lead to a result that the City of Gary can properly try to prevent. 491 F.2d at 163–64.

As above indicated, the Township Council did not act rapidly or capriciously or arbitrarily herein. It waited two years to act. It investigated. It consulted. It held two public meetings. It exercised its unanimous judgment, in carrying out its prescribed duty, on the basis of its experience with the panic-selling threat to the community. That the full results of the panic-selling here sought to be terminated were incipient, rather than extant as in *Barrick,* cannot be controlling.

The district court found that Willingboro's goal "of alleviating problems of panic-selling is meritorious," but distinguished *Barrick* on the basis that the evil results of panic-selling (reduction in property values, segregation, and ghetto[16] establishment)

16. The district court apparently defined "ghetto" as an area of low property values and deterioration caused by its inhabitants, rather than as simply an area of minority concentration:

had not yet happened in Willingboro. Plaintiff's counsel made the same argument before us admitting, however, that the *Barrick* result would be correct if those evil results had been proven to have occurred. But to forbid termination of a cause of panic-selling until its detrimental effects had burdened the community would be an exaltation of form over substance. That approach would bar combating at its inception the very problem now plaguing so many urban areas where measures such as "busing" are now found necessary.[17] To force Willingboro to await the evils of segregation, which it has so successfully avoided to date, so that the principle of *Barrick* may thereafter be employed in an effort to fight back, seems to us an approach devoid of common sense.

Thus an ordinance prohibiting "For Sale" and "Sold" signs in residential neighborhoods was found constitutionally acceptable in *Barrick* as a reasonable means to halt rampant panic-selling and its resegregation effects. No reason appears of record to indicate that the same ordinance [18] is not even more constitutionally acceptable as a reasonable means to halt early panic-selling and its incipient segregation effects. The federal Fair Housing Act prohibits the

THE COURT: Low price of houses in the low twenties?
THE WITNESS: Yes.
THE COURT: Why would you think that people who could afford that would make a ghetto out of a town?
THE WITNESS: I don't. I never thought anybody would make a ghetto out of a town.
THE COURT: It must have been a previous witness.
* * * * * *
THE COURT: As a lawyer, would you be concerned about someone paying—and it's been the testimony here—that the least expensive house sold along the line, or at least that I heard of, was in the low $20,000 range.
Do you feel that someone paying that much for a house would want to turn this neighborhood into a ghetto?

17. That circumscribed neighborhoods peopled by minorities subvert the effort to desegregate public schools is set forth in *Twenty Years After Brown,* supra, note 1, p. 107 and p. 178. See, also, *Miliken v. Bradley,* 418 U.S. 717, at 724, 94 S.Ct. 3112, 3117, 41 L.Ed.2d 1069, 1079 (1974).

mere *attempt* to encourage "white flight." 42 U.S.C. § 3604(e). See *Brown v. State Realty Co.,* supra. The ordinance herein being preventive in nature and constitutionally permissible, the present case fits the adage, "an ounce of prevention is worth a pound of cure."

Nor is it critical that the court in *Barrick,* was concerned with panic-selling in "white neighborhoods." Whether the neighborhood is "white" as in *Barrick,* or fully integrated, as here, the final effect of panic-selling is the same, i. e., acceleration of a movement toward segregated housing patterns. If anything, avoidance of panic-selling may have even greater significance in a neighborhood which, like those before us, has achieved integration, the avoidance being designed to preserve that desirable condition.[19]

That the ordinance herein specifically permitted signs on model homes, where no "invisible" message was possible, further confirms the fact that the ordinance was directed against the invisible message of the signs, i. e., that people were leaving. We agree with the district court that homeowners should not assume that having black neighbors will always result in lower property values.[20] Until that day comes, as

18. The ordinance in *DeKalb Real Estate Board v. Chairman and Board of Commissioners of Roads and Revenue for DeKalb County,* 372 F.Supp. 748 (N.D.Ga.1973) cited by the district court herein, was entirely different from that before us and, of course, there was no "discrimination" to "freeze in" in Willingboro in 1974.

19. The Federal Government, by attacking zoning and other land use powers employed to prevent low income housing in suburbia, in an effort to prevent segregation in site and tenant selection, see *Twenty Years After Brown,* supra, note 1, pp. 100–108, devotes yeoman effort toward achieving what Willingboro already has. Courts should hesitate to impede the success-preserving efforts of those few communities who have succeeded in achieving integration.

20. The following transpired at trial:
A. When the first three homes that were sold changed hands from white families to black families, many white families in the neighborhood began to say that they were

come it must, when such reprehensible lumping of groups of people within broad generalities has ceased, however, the phenomenon known as "white flight" must be, and is being, dealt with. As above indicated, its existence is recognized, and its encouragement is made unlawful, in the federal Fair Housing Act, 42 U.S.C. § 3604.[21]

The Township Council recognized and attempted to deal with the same problem in adopting the ordinance before us. To slow an artificial, fear-accelerated pace of racial change is not to seek a specific population ratio and is not itself a form of racial discrimination. When a fact of human experience, such as panic-selling, is recognized and acted against by those on the firing line in the community, we the more cloistered should not interpose our conjectures regarding motive to stifle such action, in the absence of clear evidence of violation of fundamental constitutional rights.

The district court erred in attributing to the Council the unworthy views of those homeowners who would flee in response to a "blacks-lower-values" syndrome. Concluding its review of the Council's purpose, the court stated that "fear of declining property values * * * cannot be the concern of this court when it results in an abridgement of constitutional rights." But, though the Council acted in recognition of that fear, it acted to *chill its effects*, not to foster it. The proliferation of signs plays to the very fear so properly excoriated by the district court.[22] Prohibiting signs removes the genesis of that fear.[23] Striking down the ordinance cannot expunge the "sell before it's too late" notion from the minds of all homeowners in Willingboro. Contrary, of course, to its desire and intent, the district court's stifling of the Township's effort to strangle at birth the fear of blacks-lowering-values could only result in the continued, sign-generated encourage-

---

very worried and to express concern that all of the other homes that were then for sale would also go from white to black, and that the neighborhood will be changed entirely. They'd be left to desegregate the ghetto.

There was a lot of fear, and I invested a lot of time at that point trying to talk to people about not rushing to put their home on the market and move to another community just because some people were transferred in their jobs or by the military.

THE COURT: If they felt that way, why not let them go? They wouldn't be very good neighbors anyway; would they?

THE WITNESS: Perhaps not, but panic-selling is not something that seems to work very well for a community life.

THE COURT: What difference does it make where he lives or what color he is if he's a good neighbor? How would that depreciate value?

THE WITNESS: I agree with you. I agree with you. But I think when there is an atmosphere of panic, people tend to settle for less than value of the market value of their house.

THE COURT: All right.

21. § 3604. *Discrimination in the sale or rental of housing*

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

\* \* \* \* \* \*

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin. As amended Pub.L. 93–383, Title VIII, § 808(b)(1), Aug. 22, 1974, 88 Stat. 729.

22. Because of its apparent influence below, we discuss herein only the "white flight" element of the fear of lower values generated by "For Sale" and "Sold" signs. It is clear, however, that a proliferation of such signs in any neighborhood, even in a nation of citizens of one color (or in that happy nation of the color-blind), is productive of the impression that something is wrong, many are leaving and lower values are imminent. The phenomenon feeds on itself as sellers rust to avoid being "stuck." The over-supply of any product for sale is recognized as likely to lead to lower prices. Plaintiff Mellman said he personally used discretion because "too many signs in a particular area" does not market properties because "it may scare people." When asked about watches, Mellman said, "Yes, I think you can overflood any market."

23. Thus the ordinance herein parallels the federal Fair Housing Act, which makes unlawful the written expression of discriminatory intent. 42 U.S.C. § 3604(c). See also, *United States v. Hunter*, supra, denying application of First Amendment protection to an advertisement of a residence available in a "white home."

ment of that fear.[24] The ordinance herein was not adopted at the instance of those who would flee from blacks. On the contrary, it was aimed *against* the white-flighters by those who wanted whites to stay when blacks moved in. An ordinance designed to blunt the effects of a human foible should not be struck down because the foible exists. An ordinance intended and designed to impede the exercise of anti-black fear cannot itself be considered anti-black. The cancer fighter cannot be blamed for the existence of cancer.

We agree with the following statement of the NAACP Legal Defense and Educational Fund in its *amicus curiae* brief in *Barrick* (quoted at 491 F.2d 165):

> The interest of both the black and white citizens in stable communities outweighs any minor inconvenience of having to utilize alternate methods for advertisement and information gathering.

## The Effect of the Ordinance

■ The district court considered as "even more important" than the limitation of the right to express a desire to sell, its conclusion that potential purchasers would have "no way of learning what is available." We find the conclusion unsupported, in view of the record-established fact that 70% of the inquiries of purchasers stem

from other sources. As was said in *Barrick, supra:*

> One of plaintiffs' exhibits reveals that in 1972, prior to the date the ordinance became effective nearly three-fourths of Barrick Realty's home sales were to persons first attracted to the property by means other than a "For Sale" sign. Thus the ordinance does not make it unduly difficult to sell a house; it only makes it slightly more expensive to do so. Accordingly, the burden of property rights is small, and any effect on the right to travel is insignificant.

Nor can we find support in the record for the district court's conclusion that purchasers would be "forced" to use a broker, or that a broker might be the only one capable of apprising a buyer, or that "he alone" is aware of homes for sale. As the testimony made clear, newspaper ads were widely used and remained freely available. There was no indication at trial as to the percentage of homes sold through brokers prior to or after the ordinance. Moreover, the very purpose of a sign posted by a broker is to direct buyers into his hands. In this regard we note that the plaintiffs who seek reinstatement of the signs are two business entities dealing in real estate, one a broker.

But the district court went on to assume that unscrupulous realtors would engage in "steering,"[25] returning to that theme at

---

**24.** Though the district court mentioned "when the end can be more narrowly achieved," it described no other means and none appears in the record.

**25.** The only specific reference to "steering" at the trial related to a different community and constituted a denial that purchasers had to be "steered":

BY MR. HAUCH:

Q. And that is, in connection with Medford Lakes, you said that they don't have signs out there; and if it's been reported to you one of your fellows has a minority family interested and calls up out there, they say, "Don't bring them out here"; is that correct?

A. That's correct. They have taken them out there, though.

Q. All right.

Then these people have no way themselves in seeing, by riding around, what's available to you; right?

A. That's right.

Q. So they have to be steered to something, in other words?

A. No. Flip open the multiple listing book and let them find their own house. In other words, they designate the geographical area they'd like to be in relative to where they work in most cases.

Q. They have to be in your office to see this book?

A. In any municipality—

Q. Some realtor's office who is a member of M.L.S.?

A. Well, there are 82 of them in Burlington County.

Q. They have to get into an office to see the book though, whether it's your office or one of the other fellows?

A. Or read the paper, right.

Q. Or read the paper. Right?

A. That's right.

Moreover, reference to Medford Lakes was unnecessary to establish that realtors may "steer." That realtors may "steer" as well as

three points in its opinion. For the reasons given below, we think the district court erred in resting its decision on a presumption of perfidy.[26]

■ There is no evidence in the record of any racial discrimination, actual or intended, against any person or group in the sale of Willingboro residences.[27] There was no evidence that any potential purchaser had been denied equal opportunity to acquire any residence in Willingboro and no evidence of such buyer having been directed to any particular area or having been denied full knowledge of which homes were available in Willingboro. Nor was there any evidence establishing a cause and effect relationship between the ordinance and such illegal practices. There was no evidence relating the ordinance to minority house purchasers. Nor could there be. The effect of the ordinance falls equally on white and black buyers. Thus the evidence fails to support the district court's speculation that any Willingboro broker desired or

might desire to "stimulate and prey on racial bigotry and fear" or to "create or perpetuate ghettos." On the contrary, the evidence established that Willingboro had achieved an integrated status remarkably free of discriminatory practices and that the governing Council was alert to the threat to that status which resided in the cause and effect relationship between the signs and panic-selling. In the absence of evidence connecting the ordinance to racial discrimination, we cannot condemn it on those grounds.

Nor will we imply the social guilt known as racism. Society is not assisted by the implication of that insidious trait. We still have enough of the real thing around.[28]

■ The concern of the district court for the possibility of collusive racial discrimination in the sales process was thus overdrawn and at least premature. It is, of course, always possible for homeowners and brokers to enter a conspiracy in which owners would list only with brokers, both would

---

"blockbust" is recognized in law. 42 U.S.C. § 3604.

**26.** The analysis of the district court is flawed by the fact that the presumption ran only to realtors who might be "very selective which home" to show a buyer or who might "arbitrarily regulate the racial and ethnic development" of an area, i. e., realtors who might engage in "steering." The analysis makes no assumption that unscrupulous realtors might, in the absence of the ordinance, engage in an opposite form of racial discrimination, i. e., the creation of segregated areas by "blockbusting." Both forms of conduct are illegal under the federal Fair Housing Act, the former under 42 U.S.C. § 3604(d) and the latter under 42 U.S.C. § 3064(e). The district court's limitation of its view of potential perfidy may have been occasioned early in the trial, when plaintiffs' counsel objected to a question touching on "blockbusting," and described "unscrupulous realtors" as an "assumption":

MR. HAUCH: If counsel wants to ask whether or not the New Jersey statute against discrimination might restrict the market, all right. But going beyond that, unscrupulous realtors, and the other assumptions, I really can't follow or think an opinion can honestly be expressed on it.

**27.** The dissent's reference to Medford Lakes is difficult to understand. Discrimination had been rampant there for years. There was no evidence that that discrimination was due to, or

even facilitated by, an anti-sign ordinance. No Medford Lakes ordinance was placed in evidence. There was no probative evidence that Willingboro's ordinance was modeled after one of Medford Lakes. Plaintiffs' counsel cut off Evans' answer and *objected* to testimony about Medford Lakes, indicating that discrimination there was due to a "community restriction":

Q. In your opinion, as having been a realtor selling in Medford Lakes, has the sign ordinance been proposed, the ordinance there, which prohibits for sale signs being erected, has that been utilized as a furtherance of segregation in Medford Lakes?

A. Absolutely—

MR. HAUCH: If your Honor please, I just want to get one thing clear for the record. I'm not sure they have an ordinance in Medford Lakes that prohibits signs.

THE COURT: Do we know that?

MR. HAUCH: It's never been testified. I think closer to it is that there is a community restriction that's been in effect for a number of years.

**28.** The district court commented in colloquy at the trial that the "heart of the [racial] problem all along" has been "mistrust everyplace." We join that view, with the suggestion that mistrust between races will not be cured by mistrust within a race. Judicial decision cannot rest safely on suspicion.

refrain from use of either "For Sale" signs or newspaper ads, and the brokers would then lie about the availability of homes. But that possibility exists with or without the ordinance. And, with or without the ordinance, such practices would be violative of the federal Fair Housing Act, 42 U.S.C. § 3604, and of the New Jersey statute against discrimination, N.J.S.A. 10:5–1 et seq. We will not construe the ordinance as permitting that which federal and state laws forbid. A discriminatory purpose in the administration of laws fair on their face will not be presumed. *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

Nor can we visualize the massive conspiracy that would be necessary to carry out effectively the discriminatory scheme envisioned by the district court. Homes listed with any broker-member of the M.L.S. are available to all of the other 82 realtor members, among whom are two black realtors and plaintiff Mellman. That all 82 realtors would illegally "steer" black buyers into a particular area and away from other areas is so unlikely as to require strong evidence before acceptance. Moreover, such a plan would be difficult to start in Willingboro, where there was no "black" section to which blacks might initially be "steered." Further, as reflected in exhibits P–4 and P–5, the standard listing agreement with all members of the M.L.S. contained a memorandum of the Attorney General of New Jersey which set forth the illegality of "steering" and other discriminatory practices. Still further, the federal Fair Housing Act, 42 U.S.C. § 3604(g), prohibits the denial of access to M.L.S., real estate organizations, or other services relating to the business of selling and renting dwellings. That it is necessary, in order to invalidate the ordinance, to visualize the remote possibility of such a widespread conspiracy to violate the law, confirms to us the fundamental validity of the ordinance.

Racial classifications are constitutionally suspect, but the present ordinance con-

tained and effected no racial classifications. It fell, without discrimination, on all realtors and on all races, colors and creeds alike.[29] The actual effect of the ordinance, during the four months of its existence, was described at the trial by a number of witnesses, without contradiction, as appearing to have achieved its purpose. The talk of moving in fear of minorities was described as having ceased and the number of actual moves for that reason was described as having been reduced to a minimum.

### The Right to Travel

We find no evidence to support the conclusion that the ordinance burdens anyone's right to travel. Houses in Willingboro are sold through the same channels with the ordinance as they were prior to the ordinance. Sellers are free to sell to any economically qualified buyer. Economically qualified buyers of any racial group are free to buy any home in any section of Willingboro. No burden on commerce or a deterring influence on the individual right to migrate has been shown. See *Village of Belle Terre v. Boraas,* supra, note 14; *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *Construction Industry of Sonoma County v. City of Petaluma,* 522 F.2d 897 (9th Cir. 1975), petition for cert. filed Dec. 30, 1975.

The district court's "natural conclusion" regarding the right to travel rested on the erroneous belief that real estate "For Sale" signs were the only means of learning what homes were available and that the absence of such signs delivered all buyers into the hands of brokers who might be unscrupulous. The fact that 70% of inquiries come from sources other than signs, the fact that the absence of signs has the same effect on whites as on blacks, and the fact that no pattern of racial discrimination had existed in Willingboro for 14 years, all go to confirm the error in that conclusion and the error in striking the ordinance herein on that basis.

---

**29.** The dissent states the obvious principle that an ordinance having an intended purpose of limiting access of minorities to housing in the

Township could not pass constitutional muster. That principle is established, but inapplicable here.

## CONCLUSION

As discussed above, the ordinance did not deny expression, through other media such as newspaper ads, of the desire to sell. The danger present in piecemeal limitation on the exercise of constitutional rights has long been recognized. However, the prohibition of the use of residential signs as tools for proposing a commercial transaction, while leaving other and more widely used means available for such announcement, does not in our view rise to the level of an impermissible denial of the constitutional right of free speech or of the right to travel.

Balancing the interests involved we conclude, in the light of the foregoing considerations, that the governmental interest in prevention of panic-selling, and of the evils attendant thereon, is sufficient to free the ordinance banning "For Sale" and "Sold" signs on residential property in this case from constitutional infirmity.

Accordingly, the judgment of the district court must be reversed.

GIBBONS, Circuit Judge (dissenting).

This is an appeal from a final judgment of the district court, entered after a non-jury trial on the merits, based on findings of fact, holding unconstitutional an ordinance of the Township of Willingboro, New Jersey. The district court's findings of fact, far from being clearly erroneous, are compelled by the record. Those findings of fact amply justify the district court's legal conclusion. Because I believe the majority has ignored or distorted the district court's findings and has thereby substituted its own version of the facts for those found by the trier of fact, I cannot join in the court's opinion. And because even on this unsupported version of the facts the majority has misstated or misapplied the governing principles of law in sustaining the challenged ordinance, I respectfully dissent.

Ordinance No. 5–1974, which we review in this case, is an amendment to Chapter XVII of the Revised General Ordinances of the Township of Willingboro, New Jersey. Chapter XVII in twelve sections deals comprehensively with the erection and maintenance of signs. The central operative provision of the chapter is § 17–2:

17–2 Legality

Signs may be erected and maintained in the Township of Willingboro only when the same comply with the provisions of this chapter, and it shall be unlawful to erect or maintain any sign at any place within the said Township of Willingboro when the same does not comply with the provisions of this chapter.

Thus the purpose of Chapter XVII is to flatly prohibit, with enumerated exceptions, the erection and maintenance of signs in the community. Among the several exceptions to the general prohibition are those listed in § 17–6:

17–6 Residential Zones

The following signs are permitted in those areas of the Township of Willingboro which have been zoned for residential use.

There then followed, prior to the adoption of Ordinance No. 5–1974, five specific designations[1] of signs permitted in areas zoned for residential purposes. Section 17–6.5, encaptioned "Rental Signs", provided:

17–6.5 Rental Signs. Signs pertaining to the lease, rental or sale of the premises on which they appear, subject to the following conditions:

a. The size of the sign shall not exceed eight square feet in area.

b. The sign shall be located upon the premises to which it pertains and shall not project beyond the property line of such premises.

c. Such signs shall be removed within five days after the execution of any lease, rental agreement or agreement of sale for the premises in question by the occupant of the premises and/or the owner of the sign.

---

1. The other exceptions included: Nameplate or Identification Signs, § 17–6.1; Professional Signs, § 17–6.2; Non-Business Usage Signs, § 17–6.3; and Specific Recreational Activities Signs, § 17–6.4.

806

d. Not more than two such signs are to be placed upon any property.

The challenged ordinance repealed § 17–6.5. As a result of the repealer the general prohibition in § 17–2 became applicable to any sign relating to the lease, rental or sale of a home in Willingboro.

The district court found:

"[I]t appears that the true thrust of these sign ordinances is to promote a racial balance or more properly a racial imbalance in order to perpetuate existing racial lines.

There can be doubt that this is precisely the result desired by the Willingboro Town Council in adopting this ordinance."

Having found that the intended purpose of the amendment was to limit the opportunity of property owners to communicate the availability of their residences to potential minority occupants, the court went on to find:

"Even more important is the concomitant result: one who wishes to purchase a home in Willingboro has no way of learning what is available. He only has the 'option' of choosing a home from those which he is shown by a realtor, thereby necessitating the use of a real estate brokerage firm. Further, the broker or salesman may be very selective in choosing which home he wishes to show a potential buyer."

Thus the court found that both the intended purpose and the likely effect of the repealer was to limit the access of minorities to housing in the Township. No ordinance having that intended purpose and likely effect, I submit, can pass constitutional muster. Because the district court's

factual conclusions are clearly if not overwhelmingly supported by the record evidence, the judgment of unconstitutionality must be affirmed.

## I. THE TOWN COUNCIL'S INTENDED PURPOSE IN ENACTING ORDINANCE NO. 5–1974.

The plaintiffs' case consisted primarily of the minutes of two public hearings which were conducted by the Willingboro Town Council prior to the adoption of Ordinance No. 5–1974. Those minutes, Exhibit P–3, were offered "in the nature of a joint exhibit. It's agreed that they do accurately reflect what was said at the meetings on the subject." (131a–32a). After examining the minutes of those hearings one can reach only one conclusion: The unmistakeable stimulus for the proponents of repeal of § 17–6.5 was the fact that the non-white population had increased from under 12% in 1970 to over 18% in 1973.[2] Ordinance No. 5–1974 was a transparent effort to perpetuate existing racial balance and arrest the growth of Willingboro's non-white population. The transcript of the hearings alone amply supports the district court's finding that maintenance of an existing racial balance was the primary motivation behind the ordinance, and the supplementary evidence presented on behalf of the Township makes any other conclusion as a matter of law inescapable.

The Township defendant presented one exhibit, D–1, at trial. This exhibit tabulated the results of a demographic study of the racial composition of Willingboro's population over a period of years (128a):

2. See, e. g., Exhibit P–3, statements of MacNow (29a–30a); Jones (31a–32a); Kirk (40a–41a); Wortman (43a–44a); Miller (51a); Yost (56a); Turoski (59a–60a); Dubin (65a); Fleetwood Realty (72a); Wortham (76a); Taraschi (91a); Cohen (96a); Klingenberg (97a–99a); Grindlinger (102a); Connolly (108a); Boyd (110a); Cannon (110a–11a); Brooks (116a); Councilman Kearns (118a–20a); Councilman Krane (120a); Councilman Heath (121a); Councilman McGrath (122a). In footnote 4 the majority attempts to denigrate the significance

of this exhibit by emphasizing that it was admitted not for the truthfulness of the statements but only to establish what happened at the meeting. But the racist suggestions are no less evidence of motivation because they are, as I believe them to be, false. The fact remains that fear of minority in-migration was the stimulus for the ordinance. The majority apparently would require that we accept as true the underlying beliefs about minorities before we can accept the expression of such beliefs as evidence of motivation.

| Year | Total Popul. | White Popul. | Black Popul. | Other Popul. | Non-White Popul. | Percent Non-White |
|------|------|------|------|------|------|------|
| 1950 | 852 | Unavail. | Unavail. | Unavail. | Unavail. | Unavail. |
| 1960 | 11,861 | 11,801 | 6 | 54 | 60 | .005 |
| 1970 | 43,414 | 38,326 | 4,738 | 350 | 5,088 | .117 |
| 1973 | 44,607 | 36,485 | 7,637 | 485 | 8,122 | .182 |

It also offered the testimony of several witnesses. The first of these was Donald C. Evans, a proponent of the Ordinance and a Realtor whose office and residence were in Willingboro. On direct examination he testified (157a–58a; 162a):

Q. Now, listen to my question and answer that: Did you have occasion to discuss with prospective purchasers the situation in Willingboro prior to the enactment of the ordinance? I'm talking about now the amount of for sale signs and the reaction, if any, that would be developed in these prospective purchasers by this.

A. The answer is yes.

Q. What was that? What were those discussions?

A. There were many in number for people that I have taken out to show a house to. And then if there has been two or three signs on the same street, the question has been: Is there something wrong with this street? Is this street going black? And I've had that question asked of me a number of times.

Q. How about with taking it the other way, again, before the enactment of ordinance, with discussing this with prospective sellers of homes, did you similarly have discussions with them?

A. Yes.

Q. And did they have an opinion as to the situation involving signs in the township?

MR. HAUCH: If your Honor please, I have to object to him expressing someone else's opinion to this witness.

BY MR. GOTTLIEB:

Q. Was there a community assessment conveyed to you?

A. Very definitely.

Q. By purchasers—By sellers, excuse me. And what was that sentiment?

A. Yes. The sentiment was that the signs were bringing in brokers that were non-MLS from out of town, and bringing in—

THE WITNESS: How do I say, your Honor? I don't want to restrict it to 'black'—

A. (Continuing)—but minority groups in order to sell them into Willingboro.

.  .  .  .  .

Q. Well, in what way would the presence of signs lead to less of a stabilization?

A. Well, you have an opinion. People that have watched houses being sold, beside them or on the street, and there are one out of five will go to a minority, and they'll make this statement: 'Boy, the next time one goes up for sale, if another black moves onto the street, I'm going to sell and move.'

Q. Did you find this to be a prevalent attitude prior to the enactment of the ordinance?

A. Absolutely.

On redirect examination Evans was asked and answered (171a):

Q. In your opinion, as having been a realtor selling in Medford Lakes,[3] has the sign ordinance been proposed, the ordinance there, which prohibits for sale signs being erected, has that been utilized as a furtherance of segregation in Medford Lakes?

A. Absolutely—

---

3. Medford Lakes is a nearby community whose sign ordinance served as a model for the Willingboro ordinance.

The next witness called by defendants was William J. Kearns, Jr., a member of the Township Council. On direct examination he testified (179a–81a):

Q. Were you, prior to the winter of '73–'74, able to obtain a feeling on the community sentiment with respect to for sale signs in the township?

A. I believe so, yes.

Q. And what was that opinion at that time?

A. I think there was very definitely a feeling in the community that something should be done to prohibit real estate signs in the community.

I think the public sentiment started developing probably as early as '72, became somewhat more—somewhat stronger as people became more concerned in 1973, and culminated with the adoption of the ordinance in 1974.

Q. That's the general opinion.

What was the basis for that opinion in these people? Did you—in the people. Did you ever discuss this with them?

.    .    .    .    .

A. Yes, I discussed it with a number of people, and I think that the concern that was generally expressed was that people in the community were expressing a desire to sell their homes and move to other areas of Burlington County because what they sensed was a lack of stability or a large turnover in the community, and that this large turnover was resulting in a substantial influx of minority groups into the community beyond what could be sustained without the community itself turning into a ghetto within the county.

Kearns also testified that Willingboro was initially developed as an all-white community, and was integrated in the early 1960s only after a suit against the principal developer, Levitt and Sons, Inc., was successfully pressed.[4]

4. *Levitt & Sons, Inc. v. Division Against Discrimination in the State Dep't of Educ.,* 31 N.J. 514, 158 A.2d 177, *appeal dismissed per cu-*

Steven E. Heath, another member of the Willingboro Township Council, was the next defense witness to be called. He testified (205a–06a):

Would you indicate to the Court what your understanding was of the community sentiment in 1972, the beginning of '73, and so on, with respect to the posting of for sale signs in the community?

A. The community was overwhelming in favor of abolishing all for sale signs.

THE COURT: All real estate signs?

THE WITNESS: That was of a residential nature.

A. (Continuing) There was never any discussion, to my knowledge, of commercial signs at any of the meetings I attended, about commercial signs, model home signs, anything of that nature never entered into it.

There is a separate question that's going on right now about the signs of certain commercial signs and things like that.

But the specific, in fact, I believe became one of the key issues in my campaign when I was elected, the whole question of real estate signs and the nature of the community and the quality of the community we have, and the fact that we feel we have a community that's a leader in the country in terms of human relations, and that we are being taken advantage of in certain ways.

And as a consequence, a number of people in the community were beginning to lose some of the pride and the faith they had in the community.

One individual—I heard him mention specifically at a party and a number of other people say that they had to get out of Willingboro because the great experiment wasn't working, it was failing. That: 'Look what's happening to property values. Everybody wants to sell their home.'

*riam,* 363 U.S. 418, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960).

And particularly people who live in the townhouse sections of Rittenhouse Park and Fairmount Park where homes are clustered quite closely together on a court. One or two real estate signs and, you know, they look like a lot more than one or two when they are that close together. And people would say: 'Everybody in Rittenhouse wants to sell. What's happening?'

And you get five or six signs in a row on a particular street, and different neighbors on the street—I saw it happen on my own street, almost all of us. In fact, I'm the shortest with one exception, the shortest resident on my particular end of the street.

To a question put to him by the court Heath replied (206a–07a):

THE COURT: Is it a problem there—I think Mr. Kearns said it was a device—that is, this ordinance, is it a problem of minority affecting property values where you people thought it was going to get away from you? Is that a fair question, number one?

THE WITNESS: I think it's a fair question. If I can explain a little bit?

THE COURT: Yes.

THE WITNESS: Right now, and over the last few years, we have experienced an increase in property values. In the minds of most people who read the papers and follow, in the last three or four years our property values have not been increasing at a rate as great as property values in other neighboring towns. People continuously say, 'You can't buy a house for $30,000 in any other town but you can in Willingboro.' If that house was only in Cinnaminson or in Moorestown, move it a mile across the line in Westampton, it would be over $40,000.

THE COURT: You mean that was a general thing?

THE WITNESS: Because that's true in any town that was the general feeling. And the reason for this was no one wanted to buy houses. You know, when you are a property owner, whether the sales are going or not, you have a general opinion. You drive around. People would see a lot of signs. They would say: 'Everybody wants to sell. This must be because there are too many blacks in town; and if we don't do something about it, boy it's just going to go, and let's sell and get out now.'

And what we're trying to do is kind of nip it in the bud and stop it now before too much of this got out of hand.

And at this point we could stop it, still continue to have our property values rise, but stop the individual home owner from thinking: 'Boy, if I don't get out now, I am going to lose my investment.'

THE COURT: All right. Thank you for being candid with me.

Another witness, Valeria Gladfelter, a member of the Willingboro Human Relations Commission, testified about racial incidents in the early 1970s. She then said (231–33a):

Q. Were you able to ascertain a general community sentiment in Willingboro with respect to the racial situation and its relationship to the real estate for sale signs?

A. Yes, I think so.

Q. Okay.

And what is that sentiment that you were able to observe?

A. People expressed concern on seeing large numbers of for sale signs that neighborhoods would undergo rapid racial change, and this was a cause of worry to them.

She added that this expressed concern persuaded the Human Rights Commission to recommend the prohibition of "For Sale" or "Sold" signs on houses in the community. The testimony of Alexander W. Porter and the Rev. Ernest Shaw Lyght, both members of the Human Rights Commission, corroborated that of Mrs. Gladfelter. One must attach great significance to the fact that all of the defense witnesses consistently testified that the intended purpose of Ordinance No. 5–1974 was to stabilize the Township's racial balance. In my view any factual conclusion other than that drawn by the district court would be clearly erroneous.

Certainly the conclusion the court did draw is not clearly erroneous. But in utter disregard of the standard of review imposed on this court by Rule 52, Fed.R.Civ.P., the majority, by a disingenuous process of selection and omission, sifts through the record below to construct its own findings to justify a predetermined result. On this record no appellate tribunal can properly hold that the district court's conclusion respecting the Town Council's intended purpose in enacting Ordinance No. 5–1974 "(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972); R. Aldisert, The Judicial Process 690–92 (1976). The majority opinion completely inverts the respective roles of the trial and appellate courts, and is an instance of ad hoc decision making.

## II. THE LIKELY IMPACT OF THE WILLINGBORO ORDINANCE.

The majority refuses to attach any significance to the district court's conclusion that the effect of Ordinance No. 5–1974 is to steer prospective home purchasers to local real estate brokers, who may in turn be very selective in the property they wish to show a potential purchaser. It urges that the district court's conclusion is unsupported by record evidence. Manifestly there is no such absence of evidence here. Co-plaintiff William Mellman, a real estate broker with an office outside Willingboro, testified that approximately thirty percent of the inquiries to his office from prospective purchasers originated when a prospective buyer viewed a "For Sale" sign on a property he liked. (135a). Defendants' witness Evans, a broker based in Willingboro, testified that his firm was very happy maintaining an 80/20 white/non-white racial mixture in the community. (160a). He also testified that since the ordinance was adopted he acquired "a good 25 percent more of the market in Willingboro than [he] had a year ago," and that the increase resulted from the diversion of sales from an out-of-town broker unable to display its signs on homes in the community. (164a). Evans also testified that (165a; 172a):

Q. I think, going back about two, three years, were you familiar with the real estate situation in Medford Lakes with respect to posting signs or not?

A. I am very familiar with it, right.

Q. Can they post signs?

A. They cannot.

Q. How many black families are there in Medford Lakes?

A. To my knowledge, not one. I only know of the first Jewish family that moved in under great protest.

Q. And that's recent?

A. About two years ago, I believe.

Q. And I believe that back about three years ago, you were impressed with the way Medford Lakes handled their real estate transactions; weren't you?

A. No. I was impressed with Todd Realty, in the way he handled it. I was not impressed with the way that they had their integration, lack of integration.

Q. And they still have that?

A. They certainly do.

Q. And they still prohibit signs?

A. They certainly do.

. . . . .

Q. Has that been used in Medford Lakes to keep minorities out of Medford Lakes?

A. My salesmen have been asked: "Is that person black? Don't bring him out here."

Q. Okay.

In Willingboro now, bringing it back home, the prohibition of the signs, is it your opinion that the community desired this in order to prevent minorities from moving into town?

A. No.

Q. What was the community sense on this?

THE WITNESS: I think that, if I may, you Honor, I have, for instance, seven of my sales personally, a retired military—We've been all over the country. We've purchased homes ourselves in Willingboro. We think it's the greatest

place we ever found in the country. And all we want to do is maintain a stability, because we have more in Willingboro than we found in any other town. And they feel that with this sign ordinance now, they've been given the opportunity to work with compatible real estate brokers under the multiple listing service who are doing above board ethical job of selling real estate.

In paraphrase Evans testified that in Medford Lakes the local brokers, with an assist from the sign ordinance, maintained a zero quota for minorities.[5] In Willingboro, with a similar assist, the local brokers will be satisfied to maintain a 20 percent quota. The uncontradicted evidence demonstrates that the sign ordinance enhanced the competitive position of the local brokers in the market; that brokers were capable of action directed toward excluding minorities from residence in Willingboro; that in a neighboring community such action was completely effective; and that since the Willingboro ordinance was adopted "[w]e are still representing a straight about 80/20 minority to white seller and buyer, both sides just maintaining a perfect balance, and we're actually very happy." (160a). The demographic trend observed between 1970 and 1973, in other words, has been arrested. The majority's declaration that there is "no evidence in the record of any racial discrimination, actual or intended, against any person or group in the sale of Willingboro residences"[6] is patently contradicted by the record below. Again, I protest the distortion of the appellate process by which the majority substitutes its own findings for those of the district court.[7]

### III. THE GOVERNING LAW.

Guided by its findings of fact, the district court concluded that Ordinance No. 5–1974 was a regulation of speech in unlawful derogation of first amendment rights and an unconstitutional burden on the right to travel of possible home purchasers denied access to first-hand knowledge of the Willingboro real estate market. The majority addresses these constitutional arguments and concludes that the ordinance suffers no constitutional infirmity. For the reasons set forth in Part IV of the dissenting opinion, I disagree with the majority's analysis of these issues.

But there is a much simpler and more direct analysis which compels affirmance of the judgment below. The intended purpose of the ordinance is to discriminate against racial minorities by "stabilizing" the non-white population of Willingboro at not more than 20 percent. This is not affirmative action to overcome the effects of past discrimination, but is invidious discrimination of the most pernicious sort, against a discrete and insular minority seeking fulfillment of the American Dream of owning a

---

5. The majority takes me to task, Majority Opinion at 803 n. 27, for adverting to this testimony about Medford Lakes. Of course the fact that Medford Lakes' similar sign ordinance had both the purpose and effect of perpetuating racial segregation is only marginally probative of facts relating to the adoption of Willingboro Ordinance 5–1974. But it does suggest that behind a facially neutral law may lurk the most sinister of motives. Where it is shown that a particular kind of ordinance can be and has been used as a pretext for racial discrimination, it is incumbent upon courts to examine closely motives underlying adoption. A court cannot, as the majority has done, Majority Opinion at 803–804, don blinders to reality under the pretext of condemning the practice of looking for a racist under every bed.

6. Majority Opinion at 803.

7. The majority detects a fatal flaw in the district court's "presumption of perfidy." Majority Opinion at 795. The majority also faults the district court for making "no assumption that unscrupulous realtors might, in the absence of the ordinance, engage in an opposite form of racial discrimination, i. e., . . . 'blockbusting'." The record reveals, however, that the district court's "presumption of perfidy" was based on an overwhelming body of fact. In contrast, the majority cites no record evidence upon which a presumption of blockbusting can be based. Moreover, the majority correctly points out that Congress has already legislated against the practice, 42 U.S.C. § 3604(e), so no local regulation would appear necessary even if appropriate. In any event, that the ordinance may incidentally regulate illegal conduct cannot legitimize its patently discriminatory purpose.

home in the suburbs. This is a classic example of de jure racial discrimination. Certainly an ordinance which on its face manifested a purpose to maintain a racial quota in Willingboro would be facially unconstitutional. But statutes which are facially neutral have nevertheless been held to violate the equal protection clause if they are intentionally applied for discriminatory purposes. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Moreover, the Supreme Court has found de jure discrimination in statutes which are facially non-discriminatory but which were adopted as the result of a discriminatory legislative motive. *See, e. g., Griffin v. County School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).[8]

Although expressions of the Supreme Court's disinclination to review laws on the basis of legislative motive trace back to Chief Justice Marshall's admonition in *Fletcher v. Peck*, 10 U.S. [6 Cranch] 87, 130, 3 L.Ed. 162, 176 (1810), that point of view has been eclipsed by more recent events. Certainly it is too late in the day to urge that federal courts will close their eyes to patent manifestations of pernicious legislative motive, or even that they will not search the legislative backwaters for more subtle currents. Indeed, judicial review of legislative purpose is compelled by the Supreme Court's tri-partite test in establishment clause cases. *See, e. g., Meek v. Pittenger*, 421 U.S. 349, 358, 362–63, 95 S.Ct. 1753, 1759, 1762, 44 L.Ed.2d 217, 227, 230 (1975). Where, as here, evidence of a purpose of "stabilizing" the non-white population in the community is advanced by the defendants through their own witnesses as the reason for adopting the ordinance, we cannot ignore it. Where, as here, a discern-

---

8. *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), is not to the contrary. In that case an equal protection challenge was mounted against action of the City Council of Jackson, Mississippi, closing for racial reasons a public swimming pool. The Court sustained the council's action, which impacted equally upon blacks and whites. The Court admitted that language in *Griffin* and *Gomillion* suggested that an inquiry into legislative motive was relevant for equal protection purposes but distinguished them by saying that

the focus in those cases was on the actual effect of the enactments, not upon the motivation which led the States to behave as they did. In *Griffin*, as discussed *supra*, the State was in fact perpetuating a segregated public school system by financing segregated 'private' academies. And in *Gomillion* the Alabama Legislature's gerrymander of the boundaries of Tuskegee excluded virtually all Negroes from voting in town elections. Here the record indicates only that Jackson once ran segregated public swimming pools and that no public pools are now maintained by the city. Moreover, there is no evidence in this record to show that the city is now covertly aiding the maintenance and operation of pools which are private in name only. It shows no state action affecting blacks differently from whites. *Id.* 403 U.S. at 225, 91 S.Ct. at 1945, 29 L.Ed.2d at 445.

*Palmer v. Thompson* is not inconsistent with the scrutinization of legislative motive in this case. This is apparent from the next paragraph of the Court's opinion:

Petitioners have argued strenuously that a city's possible motivations to ensure safety and save money cannot validate an otherwise impermissible state action. This proposition is, of course, true. Citizens may not be compelled to forgo their constitutional rights because officials fear public hostility or desire to save money. But the issue here is whether black citizens in Jackson are being denied their constitutional rights when the city has closed the public pools to black and white alike. Nothing in the history or the language of the Fourteenth Amendment nor in any of our prior cases persuades us that the closing of the Jackson swimming pools to all its citizens constitutes a denial of 'the equal protection the laws.' *Id.* at 226, 91 S.Ct. at 1945, 29 L.Ed.2d at 445. (citations omitted).

*Palmer v. Thompson* thus holds that where there is a failure of proof as to the discriminatory *effect* of a legislative act or classification, judicial examination of legislative motive is inappropriate because even if a hostile motive were proved that would not, in the absence of evidence of effect, suffice to violate the equal protection clause. But where, as here (and as in *Gomillion* and *Griffin*), the challenged enactment has a demonstrable discriminatory impact, proof of racial animus makes out a prima facie equal protection case. *Cf. Wright v. Council of the City of Emporia*, 407 U.S. 451, 461–62, 92 S.Ct. 2196, 2202–03, 33 L.Ed.2d 51, 60–61 (1972).

ible discriminatory impact can be anticipated by operation of the challenged enactment, we must grant relief against that threat to liberty. I am completely satisfied by the case made out by plaintiffs in the court below. Ordinance No. 5–1974 is in utter conflict with the equal protection clause of the fourteenth amendment and is null and void.[9]

## IV. THE MAJORITY LEGAL ANALYSIS.

Since the majority declines to acknowledge the obvious—that Willingboro in adopting the ordinance intended to facilitate discrimination against blacks—it must of necessity deal with issues which I would not reach. Since it does so I am constrained to register my dissent from its treatment.

### (A) Free Speech

The district court held that the sign ordinance was intended to censor the message of the homeowner desiring to sell his home, and having a censorious purpose violated the first amendment. The majority holds that the district court erred. In so holding it relies on two separate lines of authority. The first, typified by *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968),[10] permits an incidental abridgment of first amendment rights by a valid governmental regulation of "non-speech" elements of conduct, as long as the infringement goes no further than is required for the accomplishment of the "non-speech" governmental purpose. The second line of cases upon which the majority relies involves the so-called "commercial speech"

exception to the first amendment. The leading case is *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). These two lines of authority, analytically quite distinct, are discussed in the majority opinion in a manner which blurs the salient differences between them. Neither separately nor together, however, do they support the conclusion that this ordinance can withstand first amendment scrutiny.

I do not share the majority's belief that the "incidental limitations" cases are at all apposite to the facts at hand. The common bond that unites this line of authority is that in each case a paramount governmental interest in regulating non-speech existed which justified restraining "speech" in an inevitable, albeit unintended and hence incidental, manner.[11] In this case, however, the shackle upon speech can hardly be dignified as incidental. The cardinal purpose of Ordinance 5–1974 is censorship of the homeowner's message. Its effect is direct and purposeful. It is not an incidental restraint. The majority seems to acknowledge that the corrosive effect Ordinance No. 5–1974 has upon "speech" is intended, not incidental, when it urges that the "limitation on noncommercial speech falls upon an unspoken or invisible 'message' or communication of a nature insufficient to override that public interest on First Amendment grounds."[12] Notwithstanding Marshall McLuhan's observation that the medium is the message, the majority cites no authority in support of its position that an ordinance which regulates the content rather than the mere presence of a sign imposes a restraint which can be characterized as incidental or otherwise permissible for first amendment purposes. Ordinance No. 5–

---

9. Neither in the district court nor here did the defendants urge that the plaintiffs, both of whom have suffered some injury in fact, lack standing to assert the discriminatory effect of the ordinance. Nor does the Township contend that it is not a proper defendant in this action. An individual, Gerald Daly, is in any event clearly a proper defendant since he has the duty of enforcing the ordinance.

10. In *O'Brien* the Court sustained the conviction of a Selective Service registrant who burned his draft card in a symbolic protest against the Vietnam War.

11. *See, e. g., United States v. O'Brien, supra; Smith v. Goguen*, 415 U.S. 566, 586–87, 94 S.Ct. 1242, 1253–54, 39 L.Ed.2d 605, 619 (1974) (White, J., concurring).

12. Majority Opinion at 795.

1974 is analogous to a law prohibiting political advertising by billboard. While I can only suppose that no court would uphold a statute so pointedly drawn,[13] I am morally certain that none would sustain it as but an incidental limitation on free speech.

Nor do I believe that the majority can find comforting support for its untenable thesis in such cases as *St. Louis Poster Advertising Co. v. City of St. Louis*, 249 U.S. 269, 39 S.Ct. 274, 63 L.Ed. 599 (1919) and *United Advertising Corp. v. Borough of Raritan*, 11 N.J. 144, 93 A.2d 362 (1952).[14] Those cases held that the general regulation of the business of outdoor advertising was within the compass of the state police power. Those cases offer neither a whit nor a jot of support for the exercise of the police power to accomplish a racially discriminatory end.

I also understand the majority to suggest, at least implicitly, that the Willingboro ordinance is a valid exercise of the municipal zoning power. What precise limitations inhere in this power are uncertain, but it may be inferred that the power itself is broad in scope. *See Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Nevertheless, the municipal zoning power derives from the state police power, *see Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and is subject to all the qualifications of that regulatory authority. I know of no case where a legislative enactment that is purposefully discriminatory has been upheld as a legitimate exercise of the police power, whether it occurs in the regulation of outdoor advertising, as discussed *supra*, or in a zoning ordinance, or in some other context. *See Village of Belle Terre v. Boraas, supra*, 416 U.S. at 6, 94 S.Ct. at 1539, 39 L.Ed.2d at 802. By the same token, I know of no case which has ever justified the use of the zoning power for a purpose forbidden by the first amendment. The defendants perhaps recognize the implausibility of such a

broad interpretation of the zoning power, for at no point in this litigation have defendants even hinted that the Willingboro ordinance could be validated on *Euclidean* grounds.

Since censorship of the message was the intended purpose and effect of Ordinance No. 5–1974, justification must be found, if anywhere, in authorities placing the message beyond the pale of the first amendment. The majority suggests the "commercial speech" doctrine fills the bill. That doctrine, if it can any longer be so dignified, originated in *Valentine v. Chrestensen, supra*. Justice Roberts' opinion is a singularly abrupt and cryptic treatment of a supposed exception to the first amendment, completely devoid of references to supporting authority. It was handed down in 1942, hardly a vintage year for first amendment jurisprudence. *See also Jones v. Opelika*, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942), *rev'd per curiam on rehearing*, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943).

By 1943 it may be inferred that the Court was having second thoughts about the wisdom of *Valentine v. Chrestensen*, and expressly declined to extend the case beyond the pamphleteering context. *See Murdock v. Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292, 1297 (1943); *Martin v. Struthers*, 319 U.S. 141, 142 n. 1, 63 S.Ct. 862, 87 L.Ed. 1313, 1316 (1943); *Jamison v. Texas*, 318 U.S. 413, 417, 63 S.Ct. 669, 672, 87 L.Ed. 869, 873 (1943). Thereafter the commercial speech exception more or less withered on the vine, as it were, until 1973, when in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669, 676 (1973), Justice Powell cited *Valentine v. Chrestensen* with what some might regard as tacit approval. In *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), however, the Court reversed a conviction under a state statute making it a misdemeanor to publish any matter encour-

---

**13.** *Cf. Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 128–30, 93 S.Ct. 2080, 2099, 2100, 36 L.Ed.2d 772, 798–799 (1973).

**14.** Majority Opinion at 797 n. 13.

aging another to have an abortion. Since the defendant was the editor of a newspaper which published a paid advertisement placed by a New York Abortion Clinic, the commercial speech issue was squarely presented. Writing for seven members of the Court Justice Blackmun said of *Valentine v. Chrestensen*:

> But the holding is distinctly a limited one: the ordinance [banning handbills] was upheld as a reasonable regulation of the manner in which commercial advertising could be distributed. The fact that it had the effect of banning a particular handbill does not mean that *Chrestensen* is authority for the proposition that all statutes regulating commercial advertising are immune from constitutional challenge. The case obviously does not support any sweeping proposition that advertising is unprotected *per se.*[6]
>
> [6] Mr. Justice Douglas, who was a Member of the Court when *Chrestensen* was decided and who joined that opinion, has observed, "The ruling was casual almost offhand. And it has not survived reflection." *Cammarano v. United States,* 358 U.S. 498, 514, [79 S.Ct. 524, 3 L.Ed.2d 462] (1959) (concurring opinion). Mr. Justice Brennan, joined by Stewart, Marshall, and Powell, JJ., has observed, "There is some doubt concerning whether the 'commercial speech' distinction announced in *Valentine v. Chrestensen . . .* retains continuing validity." *Lehman v. City of Shaker Heights,* 418 U.S. 298, 314 n. 6, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (dissenting opinion). See also *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 393 (1973) (Burger, C. J., dissenting); *id.,* at 398 (Douglas, J., dissenting); *id.,* at 401 (Stewart, J., dissenting).

*Id.* at 819–20 & n. 6, 95 S.Ct. at 2231, 44 L.Ed.2d at 610.

Justice Blackmun pointed out that the *Pittsburgh Press* majority did not rest its decision on any commercial advertising exception to the first amendment, and in fact reaffirmed the holding of *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700 (1964) that commercial advertising enjoys first amendment protection.[15]

15. 421 U.S. at 821, 95 S.Ct. at 2232, 44 L.Ed.2d at 611. *Pittsburgh Press* held that the speech in question—sex-segregated want ads—ad-

It would seem, then, that *Bigelow v. Virginia* has laid to rest once and for all the notion that *Valentine v. Chrestensen* placed commercial advertising in the category of unprotected speech along with fighting words, *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), obscenity, *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), libel, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) or incitement, *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). The majority may think otherwise, but I find the recently-expressed views of seven members of the Supreme Court more authoritative. See *Terminal-Hudson Electronics, Inc. v. Department of Consumer Affairs,* 407 F.Supp. 1075 (C.D.Cal. Jan. 6, 1976); see also *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829 (8th Cir. 1976); *Virginia Citizens Consumer Council, Inc. v. State Board of Pharmacy,* 373 F.Supp. 683 (E.D.Va.1974), *prob. juris noted,* 420 U.S. 971, 95 S.Ct. 1389, 43 L.Ed.2d 650 (1975) (No. 74–895).

Having taken *Valentine v. Chrestensen* out of the unprotected speech category the *Bigelow* Court, while acknowledging that advertising could be subjected to regulation aimed, for example, at preventing the perpetration of illegal activities, concluded that the Virginia statute, as applied to advertising of legal activities, violated the first amendment. Justice Blackmun's analysis thus seems quite close to, if not identical with, that of *United States v. O'Brien, supra. Valentine v. Chrestensen,* thus viewed, appears to be nothing more than an application of the "incidental limitations" authorities. But whether it has been reduced to that status, or has some additional content, the case certainly cannot any longer be read as the majority reads it. There is no commercial advertising exception to the first amendment. The state may not adopt a law for the intended purpose of proscribing the advertising of a lawful activity. That was the intended purpose of

vanced an illegal commercial proposal, and for that reason was stripped of its first amendment shield.

Ordinance No. 5–1974, and the district court correctly held that it violated the first amendment.[16]

#### (B) *Right to Travel*

The district court, having found that the effect of the ordinance was to require prospective home purchasers to utilize the services of real estate brokers, drew the conclusion that it infringed upon the constitutional right to travel. Since I would hold that the ordinance involved de facto racial discrimination it is not necessary to rely on such esoteric areas of fourteenth amendment learning. But in fairness to the district judge I must again take issue with the majority's treatment of the record. Rejecting the factual predicate for the right to travel holding, the majority says

"We find no evidence to support the conclusion that the ordinance burdens anyone's right to travel.

.    .    .    .    .

The district court's 'natural conclusion' regarding the right to travel rested on the erroneous belief that real estate 'For Sale' signs were the only means of learning what homes were available and that the absence of such signs delivered all buyers into the hands of brokers who might be unscrupulous. The fact that 70% of inquiries come from sources other than signs, the fact that the absence of signs has the same effect on whites as on blacks, and the fact that no pattern of racial discrimination had existed in Willingboro for 14 years, all go to confirm the error in that conclusion and the error in striking the ordinance herein on that basis."[17]

These statements are seriously misleading. Mellman testified that where signs are permitted 30 percent of the inquiries directly result from their display, and 30 to 35 percent result from newspaper and other advertisements. (147a). Thus according to the record evidence elimination of signs may produce a 30 percent reduction in inquiries. That substantial numbers of inquiries are generated by newspaper advertisements suggests that at least in some cases that medium may satisfactorily convey the homeowners' and real estate brokers' message. But that is not to say, as the majority blithely assumes, that Ordinance 5–1974 in operation would not cut off large numbers of prospective purchasers from meaningful knowledge of the Willingboro real estate market. Moreover, Evans' testimony establishes that his Willingboro brokerage office has benefited by the sign ordinance to the extent of a 25 percent increase in business. Certainly this uncontroverted evidence supports the district court's conclusion that the tendency of the ordinance is to force prospective purchasers to resort to brokers who might "stimulate and prey on racial bigotry and fear to create or perpetuate ghettos."

I protest the departure from settled principles of appellate review which the majority opinion represents. I would affirm the judgment of the district court.

---

**16.** The majority's first amendment analysis borrows heavily from the Seventh Circuit's opinion in *Barrick Realty Inc. v. City of Gary*, 491 F.2d 161 (7th Cir. 1974). I believe that the *Barrick* court's reasoning is flawed, for substantially the same reasons advanced in this dissent. I therefore reject *Barrick's* analysis as unpersuasive.

**17.** Majority Opinion at 804.